STATE, ex rel. PATTERSON *v.* BD. OF SUPERVISORS OF WARREN COUNTY

No. 40638 April 21, 1958 102 So. 2d 198

242

*Butler, Snow, O'Mara, Stevens & Cannada,* Jackson;
*Dent, Ward & Martin,* Vicksburg; *Joe T. Patterson,* Attorney General, Jackson, for appellant.

244

[redacted] 

[redacted]

*Teller & Biedenharn,* Vicksburg, for appellees.

[redacted]

248

KYLE, J.

Joe T. Patterson, Attorney General, filed a petition in the Circuit Court of Warren County against the members of the Board of Supervisors of said county and the members of the Vicksburg Bridge Commission, asking that the court issue its writ of mandamus directed to the

defendants, and each of them, commanding them to apply all of the funds in the ''Adequate Return Fund'', as defined in Article 4, Section 4.05, of a resolution of the Board of Supervisors of Warren County, dated November 12, 1953, authorizing and directing the issuance of $2,785,000 of Warren County Bridge Revenue Refunding Bonds to the ''Replacement and Improvement Fund'', as defined in Article 4, Section 4.06, of said resolution, and commanding the said defendants to transfer any funds on hand in the said ''Adequate Return Fund'' at the time of the filing of said petition, and any funds thereafter received for the account of said ''Adequate Return Fund'', into the said ''Replacement and Improvement Fund''; and also asking that said defendants, and each of them, be further ordered to expend all funds received from the operation of said bridge in strict accordance with Chapter 283 of the Laws of 1938 (Section 8448-8469, Code of 1942), and Chapter 422 of the Laws of 1948 (Chapter 8469.5, Code of 1942). The petitioner also asked that the writ of mandamus contain such other directions and additions as the court should deem meet and proper.

The purpose of the suit, as stated in the appellant's brief, was to stop the diversion of tolls received from the operation of the Vicksburg Bridge to the use of the county for general county purposes, and to compel the defendants to apply the same to the uses specified in Chapter 283 of the Laws of 1938.

The petition and the exhibits attached thereto show that the Vicksburg Bridge was constructed by the Vicksburg Bridge and Terminal Company, a Delaware Corporation, under authority of a special Act of Congress, Public, No. 170-69th Congress, H. R. 9758, approved May 3, 1926, entitled, ''An Act Granting the consent of Congress to the Vicksburg Bridge and Terminal Company to construct, maintain and operate a bridge across the Mississippi River at or near the City of Vicksburg, Mis-

sissippi." In Section 1 of that Act the consent of Congress was granted to the Vicksburg Bridge and Terminal Company, its successors and assigns, to construct, maintain and operate a bridge and approaches thereto across the Mississippi River at a point suitable to the interest of navigation, between a point in the City of Vicksburg at or near the crossing of the Dixie Overland Highway, and a point opposite in the State of Louisiana, in accordance with the provisions of the Act of Congress, entitled, "An Act to Regulate the Construction of Bridges and Navigable Waters", approved March 23, 1906. In Section 2 of the Act approved May 3, 1926, the right of eminent domain was conferred upon the Vicksburg Bridge and Terminal Company for the purpose of acquiring land and other property needed for the location, construction and operation of the bridge and its approaches; and in Section 3 of the Acts the company was authorized to fix and charge tolls for travel over such bridge, and the rates so fixed should be the legal rates until changed by the Secretary of War under the authority contained in the Act of March 23, 1906.

Sections 4 and 5 of the Vicksburg Bridge Act then provided as follows:

"Sec. 4. After the date of completion of such bridge, as determined by the Secretary of War, either the State of Mississippi, the State of Louisiana, any political subdivision of either of such States within or adjoining which any part of such bridge is located, or any two or more of them jointly, may at any time acquire and take over all right, title and interest in such bridge and approaches, and interests in real property necessary therefor, by purchase or by condemnation in accordance with the law of either of such States governing the acquisition of private property for public purposes by condemnation. * * *

"Sec. 5. If such bridge shall be taken over and acquired by the States or political subdivisions thereof under the provisions of Section 4 of this Act, the same may thereafter be operated as a toll bridge; in fixing the rates of toll to be charged for the use of such bridge, the same shall be so adjusted as to provide as far as possible a sufficient fund to pay for the cost of maintaining, repairing and operating the bridge and its approaches, to pay an adequate return on the cost thereof, and to provide a sinking fund sufficient to amortize the amount paid therefor within a period of not to exceed thirty years from the date of acquiring the same. After a sinking fund sufficient to pay the cost of acquiring such bridge and its approaches shall have been provided the bridge shall thereafter be maintained and operated free of tolls or the rates of toll shall be so adjusted as to provide a fund not to exceed the amount necessary for the proper care, repair, maintenance and operation of the bridge and its approaches. * * *."

The bridge was completed in the year 1930 at a cost of approximately $6,300,000, and was operated by the Vicksburg Bridge and Terminal Company and its successor, the Vicksburg Bridge Company, for a period of several years. Some additional lands were acquired after the construction of the bridge, and additional improvements were made, which raised the total cost of the bridge and its approaches to approximately $7,000,000. The revenues derived from the operation of the bridge during the depression years were insufficient to meet its fixed charges; and after several years of temporary financing a receivership was established; voluntary and involuntary bankruptcy proceedings were later instituted; and the affairs of the bridge company were administered by trustees under the supervision of the Federal Court until 1938 when a plan of reorganization was

effected. Under the plan of reorganization, title to the bridge and its appurtenances was vested in the Vicksburg Bridge Company, a Delaware Corporation, and first mortgage 30-year bonds, dated May 15, 1938, were issued to the bondholders of the old corporation.

Sometime during the early part of 1947 it became known that the owners of the stock of the Vicksburg Bridge Company were willing to sell the bridge to Warren County, and the Board of Supervisors of that County entered into negotiations with the Sargem Corporation, a holding company, which owned or controlled all the stock of the Vicksburg Bridge Company, for the purchase of the bridge under authority of Chapter 283, Laws of 1938, known as the ''Bridge Revenue Bond Act.'' As a result of these negotiations the Board agreed on March 27, 1947, to purchase the bridge for the sum of $7,000,000, and to issue and sell $7,000,000 of bridge revenue bonds under authority of the above mentioned Act, for the purpose of financing the acquisition of the bridge. The purchase was immediately effected by the Bridge Company calling for payment all of the outstanding first mortgage thirty-year bonds dated May 15, 1938, which amount to $4,805,750, and by the county acquiring all of the stock of the Bridge Company. The Board of Supervisors issued the $7,000,000 of bridge revenue bonds under authority of Chapter 283, Laws of 1938, and the bonds were sold to The Sargem Corporation. The proceeds derived from the sale of the bonds were applied to the payment of the above mentioned first mortgage thirty-year bonds of 1938, which had been called for payment, and the purchase price of the Vicksburg Bridge Company stock which amounted to $2,100,000. The resolution providing for the issuance of the $7,000,000 of bridge revenue bonds provided for the application of tolls and other revenues derived from the operation of the bridge in strict conformity with the provisions of Section 11 of said Chapter 283, Laws of 1938. The resolution provided that, ''Said bonds shall be payable solely from the revenues of said

bridge as said revenues are hereinafter defined in this resolution.'' The resolution also provided that, ''Said bonds shall not constitute an indebtedness of the county within the meaning of any constitutional or statutory restriction, limitation or provision; and the taxing power of the county is not pledged and shall not be pledged to the payment of said bonds or the interest thereon.''

In 1948 the Legislature by the enactment of Chapter 422, Laws of 1948 (Section 8469.5 Code of 1942, Recompiled), authorized the governing authorities of any county or city owning any combined railway and highway bridge over the Mississippi River and having issued its revenue bonds for the acquisition thereof, to create a commission to be charged with the management and operation of the bridge; and the Board of Supervisors of Warren County, after the passage of the Act, appointed a five-member Commission to manage and operate the Vicksburg Bridge. Vehicular traffic over the bridge increased rapidly, and by the end of the year 1953, $4,215,000 of the $7,000,000 bridge revenue bonds dated April 15, 1947, had been paid from revenues derived from the operation of the bridge, leaving a balance of only $2,785,000 of the original issue outstanding. The board of supervisors then decided to refund the $2,785,-000 of bonds and reduce the amounts of bonds to become due each year thereafter; and on November 12, 1953, the Board, by resolution duly adopted and entered upon its minutes, called for redemption on April 1, 1954, the above mentioned $2,785,000 of bonds of the original issue, and by another resolution adopted on the same date directed the issuance of bridge revenue refunding bonds in the same amount for the purpose of refunding the bonds thus called for payment. The resolution providing for the issuance of the refunding bonds directed that the bonds be dated January 1, 1954, and be made to mature in approximately equal annual installments over a period of sixteen years.

In Article 4 of the resolution providing for the issuance of said refunding bonds, the Board of Supervisors ordered that all tolls and other revenues received from the operation of the bridge and its approaches be deposited daily in a special account in the name of the county to be known as the "Vicksburg Bridge Revenue Account", in the First National Bank and Trust Company, of Vicksburg, Mississippi, which was designated as the subfiscal agent of the county for such purpose. And it was further ordered in said resolution that, on the first business day of each calendar month thereafter, the subfiscal agent should make allocations of funds from the Bridge Revenue Account as follows: That the subfiscal agent should first pay from the Bridge Revenue Account into a special fund, to be known as the "Vicksburg Bridge Operation and Maintenance Fund", an amount sufficient to pay all operating expenses for such month; that the subfiscal agent should next pay from the Bridge Revenue Account and forthwith remit to the fiscal agent such sum as might be required for the payment of the principal of the refunding bonds due on January 1st next following, and one-sixth of the amount required for the payment of interest on said refunding bonds on the next interest payment date; that the subfiscal agent should next pay from the Bridge Revenue Account and remit to the fiscal agent such sum as might be necessary to maintain a balance of not less than $250,000 in a separate fund known as the "Debt Service Reserve Fund"; that after making the transfers provided for above, the subfiscal agent should next pay from the Bridge Revenue Account into a separate fund to be known as the "Adequate Return Fund" the sum of $23,000; and that, after making all of the above mentioned transfers, the subfiscal agent should next pay from the Bridge Revenue Account into a separate fund to be known as the "Replacement and Improvement Fund" the entire balance remaining in said revenue account.

In Article 4 of the resolution it was further ordered as follows:

"4.11. The moneys in the Adequate Return Fund shall be paid out by the Sub-Fiscal Agent at such times, and in such manner and for such purposes as may be ordered by the Board. The Board, however, shall order the transfer of any moneys in the Adequate Return Fund to the Fiscal Agent in the event of a deficiency in the Debt Service Fund which cannot be supplied by transfer from the Debt Service Reserve Fund.

"4.12. No moneys in the Replacement and Improvement Fund shall be paid out by the Sub-Fiscal Agent except upon a proper order of the Board of Supervisors, accompanied by a certificate of the Consulting Engineer certifying that such payment is necessary for extraordinary improvements, repairs, painting and replacements to the bridge or its approaches, or to meet any contingencies or emergencies arising in connection with the bridge or its approaches, or the operation thereof, not otherwise provided for, specifying the payee and the particular purpose for each such payment. If at any time the Board finds that the balance standing to the credit of the Replacement and Improvement Fund is in excess of the amount reasonably required for the aforesaid purposes, the Board may transfer the amount of such excess to the Debt Service Fund held by the Fiscal Agent and use the same to redeem bonds prior to maturity according to the terms thereof. The Board, however, shall order the transfer of any moneys in the Replacement and Improvement Fund to the Fiscal Agent in the event of a deficiency in the Debt Service Fund which cannot be supplied by transfer from the Debt Service Reserve Fund.

"4.13. The moneys in the Adequate Return Fund and in the Replacement and Improvement Fund, in the discretion of the Board, may be invested and reinvested in any securities which are eligible under the laws of

the State of Mississippi as collateral for deposits of county funds. * * *.''

In Section 7.01 of Article 7 of the resolution, it was provided that: .

''In the event any one or more of the provisions of this resolution or of the bonds or coupons issued thereunder shall for any reason be held to be illegal or invalid, such illegality or invalidity shall not affect the other provisions of this resolution or of said bonds and coupons, but this resolution shall be construed and enforced as if such illegal or invalid provisions had not been contained therein.''

In a subsequent section of Article 7 of the resolution, it was further ordered that the sum of $500,000 be transferred from the surplus on hand with the subfiscal agent to the ''Adequate Return Fund'', created in Article 4, Section 4.05 of the resolution. And finally, it was ordered that ''This resolution shall take effect upon adoption; provided, however, that the refunding bonds herein authorized shall not be issued and delivered unless and until the proceedings for the sale and issuance thereof shall have been validated by an act of the Legislature of the State of Mississippi.''

The Legislature was in session at the time of the adoption of the resolution authorizing and directing the issuance of the refunding bonds in the amount of $2,785,-000, and a bill was introduced in the House of Representatives to validate the proceedings of the Board of Supervisors in the matter of the issuance and sale of said bridge revenue refunding bonds. The bill (H. B. No. 63) was passed and was approved by the Governor on November 30, 1953. The validating act appears as Chapter 74, of the General and Local and Private Laws of Mississippi, Extraordinary Session of 1953.

Copies of the above mentioned orders, resolutions and proceedings of the Board of Supervisors relating to the acquisition of the Vicksburg Bridge, and the issuance

of the $7,000,000 bridge revenue bonds, and the $2,785,-000 refunding bonds were filed as exhibits to the Attorney General's petition herein; and the facts which we have stated above are facts set forth in the petition and the exhibits.

The Attorney General in his petition, after stating the facts relating to the acquisition of the bridge by the county and the issuance of the $7,000,000 of bridge revenue bonds dated April 15, 1947, and the later issuance of the $2,785,000 of refunding bonds dated January 1, 1954, as set forth above, alleged that the original enabling act, Chapter 283, Laws of 1938, under which Warren County was authorized to purchase the bridge, specifically authorized the Board of Supervisors to fix tolls for transit over the bridge and collect the same, such tolls to be so fixed and adjusted in respect of the aggregate of tolls from the bridge, as to provide a fund sufficient with other revenues of the bridge, if any, to pay (a) the cost of maintenance, repairing and operating such bridge, unless such cost should be otherwise provided for, and (b) the bonds and interest thereon as the same become due, subject, however, to any applicable law or regulation of the United States of America now in force or hereinafter to be enacted or made; and that said enabling act further provided that the tolls from such bridge should be used to pay the cost of maintaining, repairing and operating such bridge and to provide a sinking fund which should be pledged to and charged with the payment of such bonds and the interest thereon as the same become due, and any premium upon bonds retired by call or purchase as provided in said act; and that, when the bonds issued for such bridge and the interest thereon had been paid, or a sufficient amount provided for their payment, the governing authority of the county issuing such bonds should cease to charge tolls for the use of the highway portion of the bridge unless tolls were required for maintaining, repairing and operating the bridge.

The Attorney General further alleged in his petition that under the above mentioned statute Warren County was prohibited in express language from diverting any of the funds received from the operation of said bridge to purposes other than those set out in said statute, and the county was prohibited from using any of said funds for general county purposes; that the Local and Private Act (Chapter 74, Laws of Extraordinary Session, 1953), enacted at the Extraordinary Session of 1953, was enacted for the purpose of validating the refunding bonds therein referred to, and could not and did not authorize the county to take the funds received as tolls from the operation of said bridge and use said funds for general county purposes in violation of the general statute. The Attorney General further alleged that the county had never used or invested any of its money or its credit in the acquisition or maintenance of the bridge, and therefore had no investment on which it was entitled to a return; that the creation of the "Adequate Return Fund" on the premise that the county was entitled to a return on its investment was contrary to law; and that the placing of said funds in the "Adequate Return Fund" constituted the placing of said funds in an account not authorized by law.

The petitioner then charged on information and belief that the Board of Supervisors were expending the funds allocated to the "Adequate Return Fund" for purposes other than those set out in the general statutes (Chapter 283, Laws of 1938; Chapter 422, Laws of 1948). The petitioner alleged that the general statutes required the application of all such funds to the "Replacement and Improvement Fund", as set out in the resolution of the Board of Supervisors of November 12, 1953, which account was charged with the maintenance and improvement of said bridge, and the retirement of the bonded indebtedness thereon, and that the defendants should be compelled to apply the tolls received from the operation of the bridge in compliance with the law.

The petitioner therefore prayed that upon the hearing of the petition a writ of mandamus be issued directed to the defendants, commanding them to apply all of the funds in the "Adequate Return Fund" as defined in Section 4.05 of the resolution of the Board of Supervisors dated November 12, 1953, to the "Replacement and Improvement Fund," as defined in Section 4.06 of said resolution; that the defendants be further commanded to transfer any funds on hand in the said "Adequate Return Fund" at the time of the filing of the petition, or thereafter credited to the said "Adequate Return Fund", into the said "Replacement and Improvement Fund"; and that said writ of mandamus contain such other directions as the court should deem meet and proper.

The defendants incorporated four separate defenses in their answer to the petition.

In their first defense the defendants averred that the complaint failed to state a cause of action upon which relief might be granted. In their second defense the defendants admitted that the cost of the bridge had been paid from funds realized by the county through the issuance and sale of its bridge revenue bonds in the sum of $7,000,000, but denied as a conclusion of law and of fact, that the county had no investment in the bridge. The defendant admitted the allegations of the petition concerning the issuance of $2,785,000 of Vicksburg Bridge revenue refunding bonds under authority of the resolution of the Board of Supervisors adopted on November 12, 1953; and the defendants admitted that an "Adequate Return Fund" had been created under authority of said resolution, and that the sum of $500,000 had been placed in the "Adequate Return Fund", as provided for in the resolution, and that an additional $23,000 had been placed in the said fund each month since the adoption of the resolution. The defendants specifically denied, however, that there was no statutory authority for the allocation

of funds received from the operation of the bridge to the county as an adequate return to Warren County.

In their third defense the defendants averred that the Vicksburg Bridge was a combined highway and railway bridge; that the bridge had been operated as a toll bridge only as to the highway portion thereof; that its railroad facilities had been leased in practical perpetuity to the Yazoo & Mississippi Valley Railroad Company, now a part of the Illinois Central Railroad System, upon a per car rental basis; that there were other rentals for telephone lines and gas pipe lines, which produced a subsantial portion of the gross revenues of the bridge; that these lease contracts had been acquired by Warren County as a successor in title to the franchise and assets of the former bridge company, and to obtain the benefits thereof the county had necessarily undertaken and fulfilled the obligations thereof as lessor.

In their fourth defense the defendants alleged by way of special and separate pleas, that the petitioner was not entitled to maintain the action which had been brought against them or obtained the relief sought by way of mandamus, for the following reasons:

(1) That the Legislature of Mississippi, by the enactment of Chapter 74, Laws of Extraordinary Session 1953, had authorized, validated and confirmed "all of the terms, covenants and provisions" set forth in the resolution of November 12, 1953, concerning the application of the revenues of the bridge; and that the Legislature had thereby expressly approved and authorized Warren County to create and handle the "Adequate Return Fund" in accordance with said resolution and as the county had been doing.

(2) That under the terms of the Act of Congress, Public Act 170, 69th Congress, Warren County, as a political subdivision of the state, was authorized, for as much as thirty years following its acquisition of the bridge, to exact and receive from toll charges "an ade-

quate return on the cost thereof"; that the Legislature of Mississippi, in Chapter 283, Laws of 1938, granted to Warren County the privilege of exercising and the right to "exercise any powers which may be conferred upon it by the acts of Congress of the United States"; and that the Act of Congress specifically invested Warren County with the power which the petitioner was seeking to condemn.

In their fourth defense, the defendants also averred that the Attorney General, on whose relation the suit of mandamus had been instituted, had made no demand on the defendants prior to the filing of the petition for the performance of the acts which the court was asked to compel the defendants to perform; that no clear right existed to justify the granting of the relief prayed for in the petition; that the revenues from rentals and sources other than toll charges exceeded the reasonable return which Warren County was receiving from the operation of the bridge; and that it would be highly inequitable and work an undue hardship on Warren County for the relief prayed for to be granted.

The case was set down for hearing on the motion of the defendants to separately hear the pleas appearing as subdivisions 1 and 2 of the fourth defense stated in the defendants' answer. The record shows that the court treated the motion as a general demurrer; and the court was of the opinion that the motion was legally well-founded and should be sustained. A judgment was therefore entered sustaining the motion. The petitioner declined to plead further; and the court ordered that the petition for the issuance of the writ of mandamus be dismissed, and that judgment be entered in favor of the defendants.

From that judgment the petitioner has prosecuted this appeal.

The appellant's attorneys argue four points as ground for reversal of the judgment of the lower court: (1) That

the provisions of the Federal statute authorizing the construction of the bridge clearly prohibit a diversion of tolls; (2) that Chapter 283, Laws of Mississippi 1938, under which Warren County acquired title to the bridge, specifically required that all proceeds from bridge tolls be used, first, for the payment of expenses incurred in the operation and maintenance of the bridge, and second, for the payment of the bonds and interest thereon, and for no other purpose; (3) that Chapter 74, Laws of Mississippi Extraordinary Session 1953, was not intended as an amendment to the general act, Chapter 283, Laws of 1938, and if construed so as to authorize Warren County to expend a part of the tolls received from the operation of the bridge for general county purposes, said act is unconstitutional in that it violates Section 90(g), Section 90(1), Section 61 and Section 71 of the Constitution of 1890; and (4) that Chapter 74, Laws of Extraordinary Session of 1953 is violative of the commerce clause of the Constitution of the United States.

The appellees' attorneys, on the other hand, contend (1) that the Act of Congress approved May 3, 1926, authorizing the construction of the Vicksburg Bridge by the Vicksburg Bridge and Terminal Company, expressly authorized a political subdivision of the state, which might acquire the bridge after it had been constructed to pay to itself an adequate return on the cost thereof, subject only to the limitation that it would from the tolls collected amortize the amount paid therefor within a period of not to exceed thirty years from the date of its acquisition of the bridge; (2) that there is no prohibition in the general laws of Mississippi against receipt by the owner of an adequate return on the cost of the bridge; (3) that Chapter 74 of the Laws of Mississippi Extraordinary Session 1953, in and of itself, authorized the ''Adequate Return Fund'' and that said act was not violative of any of the above mentioned sections of the State Constitution; (4) that the appellant, on the face

of the proceedings, was not entitled to have issued a writ of mandamus, as prayed for in the petition.

After a careful examination of the record and the applicable statutes under which Warren County acquired title to the bridge, we think it is clear that the Board of Supervisors of Warren County had no authority to divert part of the tolls or other revenue received from the bridge operations to the use of the county for general county purposes.

The county, as we have already stated, acquired title to the bridge pursuant to the authority conferred upon the Board of Supervisors in Chapter 283, Laws of 1938, known as the "Bridge Revenue Bond Act". Section 2 of that act is as follows:

"Sec. 2. Any county or city in this state is hereby authorized and empowered:

(a) To acquire by purchase or by condemnation and to construct, or partly acquire and partly construct, and to improve, operate and maintain bridges wholly or partially within the state within such county or city or within twenty miles of the territory over which such county or city has jurisdiction and which are over the Mississippi river; and

(b) To issue bridge revenue bonds of such county or city, payable from bridge earnings, to pay the cost of such bridges.

Provided, however, that no revenue bonds or no liens securing such bonds shall be repaid in whole or in part from any funds arising from taxation, nor shall any such bonds or liens given under authority of this act constitute a lien on any other property of a city or county other than the bridge constructed or acquired under this act or a pledge of the credit of such agency unless specifically so voted by a majority of the qualified electors voting in favor of same in an election held according to law for the purpose of so authorizing."

Section 11 of said Chapter 283, provides as follows:

"Sec. 11. The governing body of any municipality issuing its bonds under the provisions of this act is hereby authorized to fix and to revise from time to time tolls for transit over such bridges and to charge and collect the same, * * *. Such tolls shall be so fixed and adjusted, in respect of the aggregate of tolls from the bridge or bridges for which a single issue of bonds is issued, as to provide a fund sufficient with other revenues of the bridge or bridges, if any, to pay (a) the cost of maintaining, repairing, and operating such bridge or bridges unless such cost shall be otherwise provided for, and (b) the bonds and the interest thereon as the same become due, subject, however, to any applicable law or regulation of the United States of America now in force or hereafter to be enacted or made. * * * The tolls from the bridge or bridges for which a single issue of bonds is issued, except such part thereof as may be required to pay the cost of maintaining, repairing, and operating the bridge or bridges and to provide such reserves therefor as may be provided for in the resolution authorizing the issuance of the bonds or in the trust indenture, shall be set aside at such regular intervals as may be provided in such resolution or such trust indenture, in a sinking fund which is hereby pledged to, and charged with the payment of, (1) the interest upon such bonds as such interest shall fall due, (2) the principal of the bonds as the same shall fall due, (3) the necessary fiscal agency charges for paying principal and interest, and (4) any premium upon bonds retired by call or purchase as herein provided. * * * Subject to the provisions of the resolution authorizing the issuance of bonds or of the trust indenture, any moneys in such sinking fund in excess of an amount equal to one year's interest on all bonds then outstanding may be applied to the purchase or redemption of bonds. All bonds

so purchased or redeemed shall forthwith be cancelled and shall not again be issued. * * *.''

Section 13 of said Chapter 283, provides as follows:

''Sec. 13. When the particular bonds issued for any bridge or bridges and the interest thereon shall have been paid, or a sufficient amount shall have been provided for their payment and shall continue to be held for that purpose, the municipality issuing such bonds shall cease to charge tolls for the use of such bridge or bridges and thereafter such bridge or bridges shall be free, unless tolls are required for maintaining, reparing, and operating such bridge or bridges due to the lack of funds from other sources than tolls; but above provisions shall not apply to common carriers, transportation companies, bus lines and any one transporting passengers or freight for hire, but shall apply only to the use of highway portion of bridge by traveling public and as respects any other use the municipality may continue to fix and collect such tolls and charges as it may deem in the public interest.''

Section 17 of said Chapter 283 defines the general powers of such county or city acquiring title to such bridge as follows:

''Sec. 17. The governing body of any municipality issuing its bonds under the provisions of this act shall have power to make and enter into all contracts or agreements necessary or incidental to the execution of its powers under this act, and may employ engineering, architectural and construction experts and inspectors and attorneys, and such other employees as may be deemed necessary, and may fix their compensation. All such compensation and all expenses incurred in carrying out the provisions of this act shall be paid solely from funds provided under the authority of this act, and no liability or obligation shall be incurred hereunder beyond the extent to which money shall have been provided under the authority of this act. Any

municipality may exercise any powers which may be conferred upon it by acts of the Congress of the United States or any adjoining state in which a portion of such bridge may be located or which are necessary or convenient for the execution of its powers under this act. * * * It shall be the duty of the governing body of any municipality issuing its bonds pursuant to the provisions of this act, in addition to the powers and duties enumerated in this act, to do and perform any and all things and acts necessary in the construction or acquisition, maintenance and operation of any bridge to be constructed or acquired under the provisions of this act, to the end that such bridge or bridges may become and be operated free of tolls as early as possible and practicable, subject only to the express limitations of this act and the limitations of the other laws and constitutional provisions applicable thereto.''

Chapter 422, Laws of 1948, authorizes the governing authorities of any county or city which has acquired title to such bridge to create a commission of not less than five nor more than seven members to manage the affairs of such bridge; and it was under authority of that act that the defendant Bridge Commissioners in this case were appointed. The powers and duties of such commissioners are defined in Section 3 of that act substantially as follows: Such commissioners, subject to the approval of such governing body, are authorized to manage and control the bridge and its approaches and the physical properties connected therewith, and to provide for the inspection, repair, maintenance and improvement of the bridge and its approaches. Such commissioners are authorized to make contracts for repairs, maintenance and improvements on the bridge properties; to employ a superintendent or manager and other presonnel; to place in effect, reclassify, revise, and change a schedule of tolls for transit over said bridge properties and alter

or revise the toll schedules as often as it shall appear necessary or proper; and to provide for the collection of such tolls and other revenues and the safe handling and deposit of the funds so received; and to "do and perform all other acts and negotiate for all other contracts which in the sound judgment of the commissioners, meeting with the approval of the governing body issuing the revenue bonds, are desirable or necessary in the interest of the proper, efficient and economical management and operation of the said bridge and the advancement of the business thereof, all toward the object of fulfilling the obligations in the trust indenture or resolution under which the governing body authorized and issued its revenue bonds and the ultimate freeing of the said bridge from tolls, as to the vehicular portion thereof, at the earliest date possible."

██ █ Counties are political divisions of the state, created for convenience. Brabham v. Board of Supervisors of Hinds County, 54 Miss. 363. ██ █ Boards of Supervisors have no implied powers. All of their acts must be authorized by law. Tallahatchie Drainage District No. 1 vs. Yocona-Tallahatchie Drainage District No. 1, 148 Miss. 182, 114 So. 264. Boards of supervisors can only exercise such powers as are expressly conferred by statute, or which are necessarily implied. Wirt Adams, State Revenue Agent, v. First National Bank of Greenwood, 103 Miss. 744, 60 So. 770. See also Lee Co. v. James, 178 Miss. 554, 174 So. 76; Green v. Board of Supervisors of Adams County, 172 Miss. 573, 161 So. 139; Simpson County v. Floyd, 192 Miss. 501, 6 So. 2d 580.

The Board of Supervisors of Warren County acquired title to the Vicksburg Bridge by the issuance of bridge revenue bonds under the special statutory authority conferred upon the Board by Chapter 283, Laws of 1938. The Board and the bridge commissioners are operating the bridge and collecting tolls and other revenue under

authority of Chapter 283, Laws of 1938, and Chapter 422, Laws of 1948; and the powers conferred upon the Board and the bridge commissioners are only such powers as are conferred by those acts.

The entire statutory scheme embodied in the two acts is designed toward making the bridge ''self-liquidating'', to provide for the payment of the cost of maintaining, repairing, and operating the bridge, and to provide for the payment of the interest on and the principal of the bridge revenue bonds as the same shall fall due, to the end that the bridge may become and be operated free of tolls as early as possible and practicable, unless tolls are required thereafter for maintaining, repairing, and operating the bridge. There is no provision in either of the above mentioned acts from which it can reasonably be inferred that the Board of Supervisors of Warren County or the Vicksburg Bridge Commission has the power to divert a part of the tolls and other revenues derived from the operation of the Vicksburg Bridge to the use of Warren County for general county purposes so long as there are revenue bonds outstanding and tolls are charged for the use of the bridge for vehicular travel. Nothing is said in either act about providing a profit for the enrichment of the county which has acquired title to such bridge, or collecting tolls to provide ''an adequate return'' on the cost of the bridge for the use of such county for general county purposes.

The record in this case shows that the entire $7,000,-000, which represented the purchase price of the bridge, was provided by the bondholders; and their right to an adequate return on their money has been amply provided for, under the terms of the statute, by the creation of a sinking fund for the payment of the principal and interest of the bonds as they mature. No part of the cost of the bridge was paid by the taxpayers of Warren County, and there is no reason to believe that the Legislature, by the enactment of either of the above mentioned

statutes, intended that the county should operate the bridge for a profit.

We have found only one case in which the Court has been called upon to consider the claim of a county to an adequate return on a bridge acquired by the issuance of bridge revenue bonds under statutes similar to our own, and that is the case of Driscoll v. Burlington-Briston Bridge Co. (1951), 8 N. J. 433, 86 A, 2d 201, cert. den. 73 S. Ct. 25, 33, 34, 344 U. S. 838, 97 L. Ed. 652, reh. den. 73 S. Ct. 181, two cases, 182, 344 U. S. 888, 97 L. Ed. 687.

In that case an action was instituted by the Governor and the Attorney General of the State of New Jersey to set aside the acquisition by the Burlington County Bridge Commission of two bridges across the Delaware River between points in Burlington County and the State of Pennsylvania. The construction of the two bridges had been authorized by separate acts of Congress passed in 1926 and 1927, which were almost identical in form with the Vicksburg Bridge Act approved on May 3, 1926. Both bridges had been acquired by the County Bridge Commission in 1948 upon representations made by the syndicate which promoted the sale of the bridges to the county that the county would realize a profit of over $4,000,000 in the operation of the bridges. The Court held that the selling syndicate in making such representations did so without any foundation in law for the statements; and in discussing the question as to the right of the bridge commission to operate the two bridges for a profit, the Court in its opinion said:

"An examination of the various statutes pertaining to bridge commissions fails to disclose any provision from which it can reasonably be inferred that they have the power to operate bridges for profit. Rather, from the fact that the powers of bridge commissions are spelled out in some detail in the statutes without mention of the right to make a profit and also from

the fact that the entire statutory scheme is designed towards making the bridges 'self-liquidating', it clearly was not the legislative intent to give bridge commissions such power. For example, N.J.S.A. 27:19-32 pertaining in part to the rate of tolls, specifically states that: 'The rate of tolls to be charged for the use of any bridge constructed or purchased under the provisions of this article shall be so fixed and adjusted as to comply with any contract or agreement of the commission relative thereto and, in any event provide a fund sufficient to pay the interest and principal of any bonds issued under this title, and to provide an additional fund to pay the cost of maintaining, repairing and operating such bridges.' No mention whatever is made of providing a profit for the enrichment of a county. Moreover, in view of the fact that a bridge commission is empowered by N. J. S. A. 27: 19-28 to acquire intercounty and interstate bridges, it would be unjust to infer that one county could profit at the expense of, and out of property located in part in another county or state. It is not necessary for us to interpret the provision in section 5 of the two federal acts authorizing the construction of these bridges to the effect that tolls may be charged 'to pay an adequate return on the cost thereof.' Quite obviously the Federal Government cannot grant a power to an agency of the State which the State itself has not seen fit to grant. Even an interpretation of the federal acts most favorable to the defendant county would only permit the State to authorize the making of a profit from the operation of the bridges. It is therefore apparent not only that the bridge commission had no authority to make a profit but that the selling syndicate in representing to the freeholders and the prospective bridge commissioners that the county would realize a profit of over $4,000,000 on the operation of the bridges was doing so without any foundation in law for the statements.''

It is argued, however, by the appellees' attorneys in the case that we have here, that the Legislature, in Section 17 of Chapter 283, Laws of 1938, vested in Warren County the specific right to exercise any powers which may be conferred upon it by the acts of Congress, which necessarily included the right to receive an adequate return on the cost of the bridge to it for as much as thirty years following the purchase. But we think there is no merit in that contention. Section 11 of said Chapter 283 provides that the tolls and other bridge revenues shall be applied to the cost of maintaining, repairing and operating the bridge, and the creation of a sinking fund pledged to and charged with the payment of the interest on the bonds and the principal thereof as they fall due. Section 13 of said Chapter 283 provides that, when the bonds are paid, or a sufficient amount provided for their payment, the county shall cease to charge tolls for the use of the bridge, and thereafter the bridge shall be free, unless tolls are required for maintaining, repairing and operating the bridge due to the lack of funds from other sources than tolls. The provisions of those two sections show clearly that the Legislature did not intend that Warren County or any other county acquiring a bridge under the provisions of that act, should be permitted to operate the bridge for profit or use the tolls collected from the operation of the bridge for general county purposes.

The primary rule of construction of statutes is to ascertain and declare the intention of the Legislature, and carry such intention into effect to the fullest degree. 50 Am. Jur., pp. 201, 202, Statutes, par. 223. The legislative intent must be ascertained from the provisions of the statute as a whole, and not from a segregated portion considered apart from the rest of the statute. Mississippi Cotton Seed Products Co. v. Stone, 184 Miss. 409, 184 So. 428. ''The words, phrases and sentences of a statute are to be understood as used, not in

any abstract sense, but with due regard to the context, and in that sense which best harmonizes with all other parts of the statute." 82 C. J. S., p. 723, Statutes, par. 348; Green v. Weller, 32 Miss. 650; McIntyre v. Ingraham, 35 Miss. 25; Wilson v. Yazoo & M. V. R. Co., 192 Miss. 424, 6 So. 2d 313.

The clause in Section 17 of Chapter 283, supra, referred to in the appellees' brief, is as follows: "Any municipality may exercise any powers which may be conferred upon it by acts of the Congress of the United States or any adjoining state in which a portion of such bridge may be located, or which are necessary or convenient for the execution of its powers under this Act." That clause manifestly has no reference to the right of any such county or city which is engaged in the operation of a toll bridge to divert a part of the tolls received from the uses specified in Section 11 of the Act. The powers referred to in the above mentioned clause of Section 17 are powers relating to the operation of a bridge over a navigable river which can be exercised only with the consent of or under authority of an act of Congress, and the powers relating to the operation of an interstate bridge which must be exercised, if exercised at all, within the territorial jurisdiction of another state and in conformity with its laws. Warren County is a political subdivision of the State of Mississippi. Its Board of Supervisors and its bridge commission exercise their powers under legislative authority conferred by the Legislature of the State of Mississippi; and there is no reason to believe that it was the intention of the Legislature in enacting Chapter 283, Laws of 1938, to delegate to Congress or the Legislature of the State of Louisiana, the right to say that a part of the tolls and other revenues received from the operation of the Vicksburg Bridge should be paid over to the county for general county purposes, when the Legislature itself had not seen fit to authorize such payment.

 ██ It is next argued by the appellees' attorneys that the Legislature, by the enactment of Chapter 74, Laws of Extraordinary Session 1953, approved and authorized Warren County to create the ''Adequate Return Fund'', in accordance with the resolution adopted by the Board of Supervisors on November 12, 1953.

Sections 1 and 2 of said Chapter 74 are as follows:

''Section 1. That all acts, proceedings and resolutions of the board of supervisors of the County of Warren, in the State of Mississippi, in relation to the issuance and sale of two million, seven hundred eighty five thousand dollars ($2,785,000.00) Vicksburg bridge revenue refunding bonds of said county dated January 1, 1954, to provide funds for the purpose of taking up and redeeming all of the outstanding Vicksburg bridge revenue bonds of said county dated April 1, 1947, and maturing and called for redemption on April 1, 1954, all as more fully described and set forth in a certain resolution adopted by said board of supervisors on the 12th day of November, 1953, shall be and the said acts, proceedings and resolutions and all of the terms, covenants and provisions set forth therein concerning the application of the revenues of said bridge and the sale and issuance of said refunding bonds, shall be and the same are hereby authorized, validated and confirmed.

''Section 2. That the aforesaid refunding bonds, when prepared, executed, issued and delivered under and in compliance with the terms and provisions of the aforesaid resolution adopted on the 12th day of November, 1953, shall be and the same are hereby declared to be valid and legally binding obligations of said county according to the terms thereof.''

We think that the above mentioned Chapter 74, Laws of Extraordinary Session, 1953, was intended to accomplish, and did accomplish only one thing, and that was to confirm and validate all acts and proceedings of the

Board of Supervisors of Warren County in relation to the issuance and sale of the $2,785,000 of Vicksburg Bridge revenue refunding bonds dated January 1, 1954, and the application of the bridge revenues to the payment thereof as they matured. Nothing is said in that act about validating the acts of the Board of Supervisors of Warren County in diverting a part of the tolls received from the operation of the Vicksburg Bridge to the use of the county for general county purposes. There is nothing in the title or the body of the act that even suggests that it was the intention of the Legislature to amend Chapter 283, of the Laws of 1938, so as to authorize the use of bridge tolls collected under said Chapter 283 for purposes other than those stated in Section 11 of said Chapter 283.

■■■ As stated by this Court in Universal Motor Company v. Newton County, 158 Miss. 873, 130 So. 791, ''* * * it has become the practice at almost every legislative session to enact curative statutes in broad terms to validate all proceedings had by any of the subdivisions of the state upon which in good faith money for public purposes has been loaned to our people, and no questions have been asked whether the money was wisely or unwisely spent.'' This Court has been ever ready to give full effect to such validating statutes. But a curative statute of that kind cannot be invoked to validate actions of an administrative body which, from the language of the act itself, there is no reason to believe the Legislature had in mind when the act was passed.

The obligation sued on in the Universal Motor Company case was a promissory note given by the county to the Motor Company for the purchase price of certain machinery, which had been purchased by the county without competitive bids. The act relied on by the appellant to cure the invalidity of the purchase of the machinery without competitive bids was Chapter 145, Laws of 1928, which was a general validating act of the kind mentioned above. The Court held that the act had reference to what

is commonly termed "money raising" proceedings, and to none other; and the Court in its opinion affirming the judgment of the lower court said:

"But it is not within the purpose of this sort of legislation, nor within the moral principle which is thereby expressed, that all irregularities in the every-day administration of the business affairs of these subdivisions of the state shall be thus periodically cured, for the very manifest reason that such a course would in a short time lead to the most unfortunate consequences in its inducements to the conscious and deliberate disregard of those essential requirements of the administrative law without which the general public business cannot be safely conducted.

"When, therefore, a curative statute is invoked as a curative of such a vital administrative defect in the everday transaction of the public business as is here presented, namely, the making of a county contract for machinery or supplies without competitive bids, there is presented a contention in respect to a purpose which it is difficult to suppose was ever intended by any legislature, and there is thus placed upon us the duty to cautiously scrutinize any act which is asserted to contain any such provision to see that the asserted effect is actually within the act."

We have carefully examined Chapter 74, Laws of Evtraordinary Session, 1953, and, as the Court said in the Universal Motor Company case, "we are of the opinion that there is no validation within it of the transaction here in issue." In view of the conclusions that we have reached that the validating effect of the act did not extend to the provisions of the resolution of November 12, 1953, providing for the creation of the "Adequate Return Fund", it is not necessary that we discuss the questions raised in the Attorney General's brief concerning the constitutionality of the act.

This is not a suit to impair in any manner the bridge revenue bondholders' contract, or to impose any control

over the amount of tolls to be charged by the Board of Supervisors of Warren County or the bridge commission for the use of the Vicksburg Bridge for vehicular travel, or to impose any restrictions upon the Board or the bridge commissioners in the exercise of their discretionary powers in managing and operating the bridge. This suit relates only to the application of the funds derived from the bridge operations.

The question presented for our decision on this appeal is the question as to the right of the appellees to divert a portion of the tolls and other bridge revenues collected in the operation of the bridge to an "Adequate Return Fund" for the use of the county for general county purposes. We think that question must be answered in the negative. There is no statutory authority for the county to operate the bridge for profit; and we think that the order of the Board of Supervisors of Warren County creating the so-called "Adequate Return Fund", as provided in Article 4, paragraph 4.05 of the resolution of the Board of Supervisors dated November 12, 1953, and directing the payment into that fund of large sums of money, derived from the collection of bridge tolls and other bridge revenues, to be expended by the Board of Supervisors for purposes other than the purposes stated in Section 11 of Chapter 283, Laws of 1938, was not authorized by any statute relating to the operation of the bridge. The order was contrary to the purpose and intent of the Legislature, as expressed in said Chapter 283, and in Chapter 422, Laws of 1948, both of which acts provide that the revenues derived from the operation of the bridge shall be applied to the payment of the cost of operating and maintaining the bridge, and the payment of the principal and interest of the bridge revenue bonds outstanding, to the end that the bridge may become and be operated free of tolls as early as possible and practicable; and the order in our opinion was neither approved nor validated by Chapter 74, Laws of Extraordinary Session, 1953.

The subject matter of paragraph 4.05 of Article 4 of the resolution was of no interest to the bondholders and constituted no material part of the bondholders' contract; and the invalidity of that paragraph does not affect or in any manner impair the rights and remedies of the bondholders under the resolution.

We think the trial judge erred in his holding that the matters alleged in the special pleas set forth in paragraphs 1 and 2 of the defendants' fourth defense were sufficient in law to constitute a defense to the Attorney General's petition, and that the trial judge erred in sustaining said pleas, and in dismissing the Attorney General's petition. On the face of the proceedings the petitioner was entitled to the relief prayed for in the petition.

The judgment of the lower court is therefore reversed and the cause remanded for further proceedings not inconsistent with the views hereinabove expressed.

Reversed and remanded.

*Roberds, Lee, Arrington, Ethridge,* and *Gillespie, JJ.,* concur. *McGehee, C. J.,* not voting.

HALL, dissenting:

I respectfully dissent from the conclusion reached by the majority in this case. As stated in the controlling opinion, the bridge in question was built pursuant to a special act of the Congress of the United States, Public No. 170 69th Congress, Chapter 226, 69th Congress. This Act authorized the Vicksburg Bridge and Terminal Company to construct, maintain and operate a bridge across the Mississippi River at or near the city of Vicksburg. Section 4 of the Act provided that after the date of completion of such bridge either the State of Mississippi, the State of Louisiana, any political subdivison of either of such States within or adjoining which any part of such bridge is located, or any two or more of them jointly,

may at any time acquire and take over all right, title and interest in such bridge and approaches, and interests in real property necessary therefor, by purchase or by condemnation.

Section 5 of the Act provides that if such bridge shall be taken over and acquired by the states or political subdivisions thereof under the provisons of Section 4 of the Act the same may thereafter be operated as a toll bridge and ''in fixing the rates of toll to be charged for the use of such bridge, the same shall be so adjusted as to provide as far as possible a sufficient fund to pay for the cost of maintaining, repairing and operating the bridge and its approaches, *to pay an adequate return on the cost thereof,* and to provide a sinking fund sufficient to amortize the amount paid therefor within a period of not to exceed thirty years from the date of acquiring the same.'' (Emphasis supplied).

Warren County was the only political subdivision of either State which would undertake the purchase of the bridge and its operation.

The controlling opinion makes many references to Chapter 283 of the Laws of Miss. of 1938 and the same is found in several sections of the Recompiled Code of 1942, beginning with Section 8448. The term ''cost of bridge'' is defined in Paragraph (e) of Section 8450 of said Code. Section 8457 provides for a trust indenture and in the concluding portion says: ''Except as in this act otherwise provided, the governing body of such municipality may provide, by resolution or by such trust indenture, for the payment of the proceeds of the sale of the bonds and the revenues of the bridges to such officer, board, or depository as it may determine for the custody thereof, and *for the method of disbursement thereof,* with such safeguards and restrictions as it may determine.'' (Emphasis supplied)

On November 12, 1953, the board of supervisors adopted and entered upon its minutes a resolution calling for

redemption of the outstanding bonds on April 1, 1954, and also adopted on the same date another resolution directing the issuance of bridge revenue refunding bonds in the same amount and for the purpose of refunding the bonds called for payment. Article 4 of this resolution is referred to in detail in the controlling opinion herein and created several separate funds into which the revenues from the operation of the bridge should be paid, among which was the "adequate return fund", which seems to follow to a large extent Section 5 of the aforesaid Act of Congress which was adopted May 3, 1926.

It is interesting to note from the majority opinion that very little is said about Chapter 74 of the Extraordinary Session of 1953, which was adopted by the Mississippi Legislature and approved by the governor on November 30, 1953. It is pertinent to quote in full Section 1 of that chapter, which is as follows: "Section 1. That all acts, proceedings and resolutions of the board of supervisors of the County of Warren, in the State of Mississippi, in relation to the issuance and sale of two million, seven hundred eighty five thousand dollars ($2,785,000.00) Vicksburg bridge revenue refunding bonds of said county dated January 1, 1954, to provide funds for the purpose of taking up and redeeming all of the outstanding Vicksburg bridge revenue bonds of said county dated April 1, 1947, and maturing and called for redemption on April 1, 1954, all as more fully described and set forth in a certain resolution adopted by said board of supervisors on the 12th day of November, 1953, shall be and the said acts, proceedings *and resolutions and all of the terms, covenants and provisions set forth therein concerning the application of the revenues of said bridge and the sale and issuance of said refunding bonds, shall be and the same are hereby authorized, validated and confirmed.*" (Emphasis supplied)

It seems to me that the Legislature either knew or should have known what it was doing when it passed

this Act, and Section 1 clearly authorizes, validates and confirms not only the bond issue as stated in the majority opinion but also all of the proceedings and resolutions, including specifically the resolution of November 12, 1953, concerning the application of the revenues of said bridge and any part of the 1938 law which might conflict with what is said in the above quotation, is clearly amended so as to conform to what is said in the above quoted Section 1. The resolution had provided for the adequate return fund and it was here authorized, confirmed and validated. The majority opinion says that nothing was accomplished by the above quoted act except the validation of all acts and proceedings of the board of supervisors in relation to the issuance and sale of the refunding bonds. I do not know of any validating act of the Legislature which goes as far as the above mentioned Chapter 74 of the Laws of 1953. I prefer to feel that the Legislature had before it everything that it was approving, authorizing and validating by this Act, and if we are going to accept the Act as written then the decision of the lower court should be affirmed. I cannot ascribe to the Legislature such ignorance as the majority opinion seems to do, and for that reason I am led to dissent.

HOLMES, J., joins in this dissent.