# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-EC-00477-SCT

*JIM HARRELD*

*v.*

*KARL BANKS*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/30/2020 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| TRIAL COURT ATTORNEYS: | SPENCER MARK RITCHIE |
| | WILLIE GRIFFIN |
| | LISA MISHUNE ROSS |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SPENCER MARK RITCHIE |
| ATTORNEY FOR APPELLEE: | WILLIE GRIFFIN |
| NATURE OF THE CASE: | CIVIL - ELECTION CONTEST |
| DISPOSITION: | AFFIRMED - 06/17/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Jim Harreld and Karl Banks ran for the position of District 4 Supervisor in Madison County. Banks won the November 5, 2019 election by fifty-seven votes. The Madison County Election Commission certified Banks as the winner of the election. Harreld challenged the election and asked the trial court to order a special election or to declare him the winner of the November election. The Madison County Circuit Court affirmed the election as certified. Harreld appeals. Because the trial court did not commit manifest error

by finding that Harreld failed to meet the requisite standard of proof necessary to overturn an election, this Court affirms the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. Banks won the Madison County Board of Supervisors District 4 election by fifty-seven votes in the November 5, 2019 general election. Banks, a Democrat, received 3,524 votes and Harreld, a Republican, received 3,467 votes. The Madison County Election Commission certified the election results and filed them with the secretary of state. Harreld filed an election contest petition with the Madison County Circuit Court alleging that three split precincts gave out thirty-seven incorrect ballot styles, that thirty-three absentee ballots were illegally counted, that nine affidavit ballots were improperly counted, that three affidavit ballots were improperly rejected, that the Statewide Election Management System (SEMS) placed voters in the incorrect supervisor district, that nine ballots were not initialed by poll managers, that one resolution ballot was not counted, and that twenty-five individuals who no longer reside in District 4 voted in the District 4 election. Harreld requested that the court decertify the election and order a special election for Supervisor District 4. He subsequently filed three amended petitions additionally alleging that six resolution ballots were not counted, that more than 200 individuals voted in District 4 who were incorrectly placed in District 4 by SEMS or who no longer reside at their listed address, and that 140 voters who reside in District 4 were incorrectly placed outside of District 4 by SEMS. He additionally requested that the court declare Harreld the winner of the election and seat him as the District 4 Supervisor. This Court appointed the Honorable Lamar Pickard as special

2

judge to preside over the matter.

¶3. The current boundaries for District 4 were proposed in 2011 by the Madison County Board of Supervisors (Board of Supervisors) based on the 2010 census. After getting preclearance for the boundaries from the United States Department of Justice, the Board of Supervisors approved the new boundary lines for the five Madison County supervisor districts on May 31, 2011. The metes-and-bounds description for the district boundaries was placed in the May 31, 2011 Board of Supervisors meeting minutes. The district lines approved on May 31, 2011, have been in effect since that date.

¶4. The parties agreed to a bench trial. At trial, Harreld first called Anita Wray, the Madison County Circuit Clerk. Wray testified that when someone registers to vote at the circuit clerk's office, the circuit clerk's office inputs the person's name and their address into SEMS and it generates a voter registration card. She noted that the secretary of state is in charge of the SEMS system. Regarding absentee ballots executed at the circuit clerk's office, Wray testified that the first thing the circuit clerk's office checks is whether the voter is an active voter on the voter rolls.

¶5. Harreld called Kay Little, the Geographic Information Systems (GIS) administrator for the Madison County Board of Supervisors, to testify. She testified that the Central Mississippi Planning and Development District (CMPDD) used the metes-and-bounds description for district boundaries, and then provided her with a legal description and a map to use for GIS. The parcel information in the GIS system comes from the Madison County Tax Assessor's Office. She noted that GIS relies on parcel identifications, and that not all

3

parcel identifications have a corresponding physical address. She testified that it was her belief that the physical county land roll was placed into SEMS to generate voter information. She had no knowledge of the process used at the secretary of state's office or what mapping component SEMS used to generate information. She testified that "I don't know how SEMS even works." The maps about which Little testified and that were shown to the circuit court were not entered into evidence and consequently are not in the appellate record.

¶6. Harreld also called a professional surveyor, Robert Michael (Mike) Barnes. Barnes testified that he plotted the boundaries for District 4 himself by using the legal metes-and-bounds description, and that then he used Google Earth and Madison County's map viewer to ascertain where certain addresses were located. He testified regarding a list of addresses that SEMS classified as being in District 4 that in his opinion are not. For example, he testified that SEMS lists an entire road as within District 4 when, in his opinion, the district boundary line runs down the middle of the road so that addresses on one side are in District 4 and addresses on the other are in District 5. He testified that 100 voters voted in District 4 whose addresses do not fall within the District 4 boundary. He testified that SEMS placed 104 voters who live in District 4 in a different district. He further testified that precinct 310 did not fall within District 4.

¶7. Barnes admitted that he was not familiar with and did not examine SEMS. He also testified that, in using the GIS system, he found discrepancies between the GIS map and the map he created, as well as inaccuracies in the GIS lines. He specifically stated that he found "some errors, some discrepancies between the legal description and what was shown up

4

there." He testified that the "legal description rules" if "the map is wrong." He stated that he based his opinions solely on the legal description and the address. He further testified that if an address were "close to the line," he would not use that address because "[i]t is too close to call." Yet, he also testified specifically that houses on opposite sides of the same street should be in different districts, meaning he did use addresses "close to the line," contradicting his assertion that he did not. The record indicates that the maps displayed at trial during Barnes's testimony were computer generated and were not entered into evidence, and they do not appear in the appellate record.

¶8.    Gary Windham, a process server and a constable in Rankin County, testified that Harreld asked him to investigate a list of fifty-six voter addresses for voters who voted in the District 4 election. The addresses were all located in Canton and Flora.[1] No indication was given at trial regarding how these particular addresses were chosen or why they were investigated. Windham testified that, in the time span of one day, he drove around and used his GPS to locate the fifty-six addresses, inspected all fifty-six addresses, and spoke to some neighbors. He testified that, for fifty-four of the addresses, the voter who corresponded to the address did not live at the address. He testified that the addresses included vacant lots, one commercial building, vacant or abandoned houses, houses under construction, or that the addresses did not exist. Windham also testified that he did not do any further investigation to identify where any of the voters then lived.

¶9.    In rebuttal, Banks called five of the voters on Windham's list, all of whom testified

---

[1]District 4 also includes addresses in Madison, Ridgeland, Jackson, and Tougaloo, among others.

5

that they lived at the listed addresses. He also called Robert Winn, a retired law enforcement officer who was the chief of police for the City of Canton from 2004-08 and the chief investigation officer for the Madison and Rankin County District Attorney's Office from 2008-18. He noted that the locations of the addresses investigated by Windham were "primarily in lower income black areas of Madison County and City of Canton and Flora." Winn testified that he did not investigate every property on Windham's list, but that he investigated a random sampling. He noted that his time was limited, and that he found "it impossible and pretty much suspicious for anyone to say that they was able to locate, find and talk with individuals, 40 - - 54 individuals within a certain period of time." He testified that "[e]ven if this list were put together in chronological order based on the street adjacent to each other or houses adjacent, it would take longer than three days, four days to do an accurate assessment of these particular properties."

¶10. Winn testified that 913 Merit Court, classified by Windham as a vacant lot, was a house, and Banks submitted a photograph. Winn stated that he spoke to the residents of the house. Winn testified that 615 Franklin Street, classified by Windham as abandoned, was occupied and submitted a photograph. He noted that the home was a duplex and that the front window was boarded up and not occupied, but that the other half was occupied and that he spoke to the resident. He stated that, in his experience, in low income areas, some homes have the appearance of being vacant, but they are not actually vacant. Winn testified that 303 Boyd Street, which Windham classified as a nonexistent address, existed and submitted a photograph.

6

¶11.    Winn testified that 582 Welch Street was indeed under construction as Windham noted, but he stated that that someone had been checking the mailbox. Winn further testified that Windham's list had one street address, 113 Harvey Watkins Drive, listed as located in Flora, when the address was actually in Canton. Windham had classified the address as a vacant lot, but Winn testified that it was not. Moreover, the voter on Windham's list corresponding to 113 Harvey Watkins Drive, Flora, was indeed the record owner of 113 Harvey Watkins Drive, Canton. Winn testified that 633 West Peace Street, listed by Windham as an abandoned house, was not abandoned, but was under construction after a fire and that Winn spoke with the contractor. He testified that the family is having it remodeled to move back in. Regarding 590 Martin Luther King Drive, which Windham listed as a vacant house, Winn found it to be occupied. Winn spoke with the next-door neighbor who stated that a family lives there. He produced a photograph of the home, which has a mowed lawn and clipped bushes and no boards on the windows.

¶12.    Harreld called Carolyn Evans, the registrar at Tougaloo College, who testified that twenty-six people who had a voting address attributed to residences on Tougaloo's campus were not enrolled at Tougaloo in November 2019. She testified that she had no personal knowledge regarding where the twenty-six people resided at that time. Harreld appears to contest twenty-five of these votes.

¶13.    Harreld called Pete Perry to testify at length regarding the election. Perry testified regarding Harreld's claims of illegal absentee ballots, illegal affidavit ballots, problematic resolution ballots, and voters at split precincts being given incorrect ballots. Perry testified

7

that, in his opinion, for six absentee ballots, the signatures on the applications and envelopes did not match and that poll workers should have rejected instead of accepted them. All six were executed at the circuit clerk's office. For two absentee ballots, Perry testified that the applications were not signed by the voter and should have been rejected. Both were executed at the circuit clerk's office. For one absentee ballot, Perry opined that two issues existed: the signatures did not match and the attesting witness was ineligible to be a witness because no seal accompanied the signature and the application had the box stating that the voter was older than 65 checked rather than disabled as is required for a witness to forego a seal. The absentee ballot envelope in the record is the envelope for persons voting absentee due to temporary or permanent physical disability, the witness signature on the application was in the location for witnesses for disabled voters,[2] and the envelope was filled out in the portion indicating that the voter had been provided assistance in marking the ballot. Perry testified that, in his opinion, one absentee ballot had an ineligible witness on the absentee ballot application. The absentee ballot envelope was the envelope for persons voting absentee due to temporary or permanent physical disability.

¶14.    For eight absentee ballots, Perry testified that the signatures did not "cross the flap" of the ballot envelope. Copies of the envelopes are in the record, and in each, the voter signed on the line requiring the voter's signature, but Perry opined that the signatures that were placed where the envelope directed the voter to sign did not cross the flap. Five of the

---

[2]The absentee ballot application has separate witnessing requirements for disabled voters than it does for all other voters qualified to vote absentee. The application therefore contains two separate places for witness signatures: one denoted for the witness for a disabled voter and one denoted for the witness for all other voters.

eight were executed at the circuit clerk's office. In several of the record copies, the flap's location is apparent, and the voter's signature starts on one side of the flap and ends on the other side of the flap. For two absentee ballots, Perry testified that poll worker notes on the applications indicated that the poll worker could not find the voter in the voter roll. Perry testified that he could not remember if he examined the poll book to determine whether those two voters were listed as voters. Both ballots were executed at the circuit clerk's office.

¶15.    For one absentee ballot, Perry stated that the voter failed to mark the reason for voting absentee, the witness to the application was ineligible, and the envelope signature did not cross the flap, despite being on the signature line. The absentee ballot envelope was the envelope denoted for persons voting absentee due to temporary or permanent physical disability, the witness signature on the application was in the location for witnesses for disabled voters, and no reason for absentee voting was marked. For one absentee ballot, Perry opined that the voter did not give a reason for voting absentee, had an ineligible witness, and did not sign the flap of the envelope at all. For one absentee ballot, Perry testified that the voter did not sign the envelope. The ballot was executed at the circuit clerk's office. For another absentee ballot, Perry testified that the application did not have a witness signature and that the signature on the envelope did not cross the flap. For one absentee ballot, Perry testified that both the application and the envelope lacked a witness signature. A witness signature appeared on the application, but not on the envelope. For one absentee ballot, Perry noted that no witness signature appeared on the envelope. The ballot was executed at the circuit clerk's office.

¶16. Perry testified that three absentee ballots from the Fearns Chapel and Canton Fire Station precincts were not counted that should have been resolution ballots. He testified that he could tell by looking at these ballots that they would not have been scanned and that he knows they were not treated as resolution ballots. The Court asked Perry how he knew that the resolution board did not examine these ballots and simply reject them. Perry responded that it would be in the resolution board's minutes, but that he did not examine the minutes. Similarly, Perry stated that he found three absentee ballots from the Lake Caroline precinct in an envelope labeled "absentee ballots unscannable." He testified that he could tell numerically that these ballots were not counted, and that they were not treated as resolution ballots.

¶17. Perry next testified about affidavit ballots. Perry testified that three affidavit ballots from the Canton Anderson Lodge precinct were marked as rejected, but still counted. He testified that he could tell numerically that the ballots must have been counted, and also that they must have been counted because the envelopes were opened and the precinct had six open envelopes and recorded six affidavit ballots. He further testified that he discovered three affidavit envelopes from the Canton Anderson Lodge precinct in a sealed ballot box. He later testified that he located the six affidavit ballots that match the six envelopes admitted as Exhibits 29 and 30. He testified that two of the names from the six affidavit envelopes were not on the affidavit register for the Canton Anderson Lodge precinct. The affidavit register contains seven names. So Perry testified that he found six affidavit envelopes and that six affidavit votes were counted from the Canton Anderson Lodge

10

precinct. The affidavit registrar contains seven names, and Perry testified that two of the names on the envelopes he found were missing from that register, which indicates that nine total affidavit ballots were cast at the precinct.

¶18. Perry testified that he located an affidavit ballot that he opined was counted due to numerical analyses, but that affidavit ballot did not coordinate with an affidavit envelope. Perry testified that at the Twin Lakes precinct, he located five affidavit envelopes and four affidavit ballots. He testified that at the Lake Caroline precinct, he located five ballots that "were in with the affidavit ballots" but found no envelopes. Perry opined that an affidavit ballot should not be counted if there is no accompanying envelope.

¶19. Perry then testified about split precincts, in which voters within the same precinct receive different ballots based on where they live and the district lines for various races. Perry examined ballot data from three split precincts. Perry represented that the ballot exhibits in the record are copies of District 4 ballots cast at each of these precincts, as compiled and copied by Perry. Perry testified that Exhibit 35 contained all of the ballots cast in the District 4 race on election day at the Fellowship Bible Church precinct, but that the exhibit did not contain that precinct's ballots that were cast in other supervisor races. He maintained that Exhibit 36 contained all of the ballots cast in the District 4 race on election day at the Canton National Guard Armory precinct, but that the exhibit did not contain that precinct's ballots cast in other supervisor races. He further represented that Exhibit 37 contained all of the ballots cast in the District 4 race on election day at the Twin Lakes Baptist Church precinct, but that the exhibit did not contain that precinct's ballots cast in

11

other supervisor races.

¶20. Perry testified that he used the numbers and the codes found in Exhibit 2, the list of Madison County voters who voted in the November 5 election, that correspond to the ballot styles for each split precinct in Exhibit 3. From this, he counted the voters listed in Exhibit 2 by hand to determine how many people voted at each split precinct who should have received each ballot style containing the District 4 race. Then, he went through the ballots and hand counted how many of each ballot style had actually been cast. By comparing the paper ballots depicting the ballot style to the pollbooks depicting which voters should receive which ballot style, Perry created a spreadsheet that showed the alleged numerical mismatch between ballot styles, alleging that the number of voters who should have received District 4 ballot styles did not match the number of that ballot style actually cast. He testified as to his belief from the numbers he generated that some people had received ballots for the District 4 race who did not live in District 4, and some people who lived in District 4 did not get ballots for the race.

¶21. For example, Perry testified that Exhibit 2 lists 244 voters who were classified under code TLG, and that code corresponds to ballot style 27; thus, he maintained that 244 people should have voted with ballot style 27, so the style 27 ballots should also number 244. He testified that he counted 264 election day style 27 ballots actually cast, and so, in his opinion, twenty people voted on election day with ballot style 27 in the District 4 race who were not District 4 residents and should not have received ballot style 27. Yet Exhibit 2 actually contains 265 voters listed under the TLG code as voters who should have received ballot

12

style 27, not 244 as Perry testified.[3] Thus, the number of voters on the list who Perry testified should have received ballot style 27 on election day is twenty-one fewer than the actual number of voters on the list who should have received ballot style 27 on election day.

¶22.   Perry's numbers for the Fellowship Bible Church precinct likewise do not comport with the record.  Perry maintained that his ballot count concluded that the final votes in the District 4 race from the Fellowship Bible Church precinct amounted to Banks receiving 228 votes and Harreld receiving 136 votes, with a total of 364 votes counted in that race from the Fellowship Bible Church precinct.  He had also concluded that a total of 372 ballots that included the District 4 race were cast, but eight ballots skipped the District 4 race.  He concluded that twelve voters received District 4 ballots at the Fellowship Bible Church precinct who should not have and that one voter did not receive a District 4 ballot who should have.  Yet, the official recapitulation report of all votes for the election lists the Fellowship Bible Church precinct as counting 219 votes for Banks and 132 votes for Harreld for a total of 351 votes counted in the District 4 race from that precinct.  Perry's claims of illegal extra ballots being counted and his methodology, however, rely on a total of 364 ballots being counted in District 4 at the Fellowship Bible Church precinct, a number that is incorrect according to the official recapitulation.  In other words, he alleges that thirteen illegal votes were cast due to incorrect ballot styles given, but his total vote count for the

---

[3]This Court used the record submitted by Harreld to replicate, multiple times, the counting and mathematical processes that Perry used to conclude that illegal votes were cast. The lists provided contain twenty-one voter names on each complete page, along with some partial pages with varying numbers of voters.  Skipping a full page of voters in counting could potentially explain why a mistake of the exact same number of twenty-one voters was made.

13

District 4 race at the precinct is thirteen votes *more* than the official vote count for that race.

¶23. Perry could not point to individual voters who received incorrect ballots. Perry did not account for numbers of ballot styles from these precincts that did not include the District 4 race to attempt to reconcile the numbers, and those ballots are not in the record. Based on Perry's counting and calculations for split precincts, Harreld claims that a total of thirty-six individuals voted in the District 4 race who did not live in District 4, and one individual voted in the District 5 race who lived in District 4.

¶24. On cross-examination, Perry testified that he did not examine the regular ballots from every precinct; he only examined the regular ballots from the split precincts. He testified that he examined the absentee ballots from all sixteen precincts.

¶25. The parties stipulated that four ballots for Banks had been counted that did not contain a poll worker's initials.

¶26. The circuit court affirmed the election results as certified. Regarding SEMS, the court noted that Harreld presented the testimony of only one witness who stated his opinion as to the alleged misplacement of voters by SEMS. It acknowledged that the boundary lines changed in 2011, but this issue has never been raised or presented to the election officials in charge of SEMS. It opined that issues relating to SEMS should be presented to those in charge of SEMS and that "[w]ithout an official change by state and local election officials in the placement of the registered voters complained of, this Court declines to invalidate those votes and, thereby disenfranchise those citizens." Regarding the Tougaloo voters, the court noted that Harreld must prove that the voter had abandoned District 4 residency with

14

no intent to return, and Harreld failed to offer any such proof. The court likewise held that Harreld's proof was insufficient to show that the voters on Windham's list had abandoned residency in District 4 with no intent to return. Regarding affidavit and absentee ballots, the court noted that no fraud was alleged and that many of the absentee ballots were obtained with the assistance of the circuit clerk. The court "carefully considered all of [sic] irregularities suggested by Harreld and certainly does not consider the technical deficiencies complained of to be a radical departure of the election procedures by election officials." It concluded that no sufficient questions were raised that cast doubt on the will of the voters and that Harreld's proof failed to prove that enough illegal votes were cast to change the election's outcome.

¶27. Harreld appeals. He argues that the circuit erred by 1) concluding that mistakes in SEMS did not require a special election, 2) ignoring ballots that were counted or not counted in violation of election law, and 3) finding Harreld's evidence regarding voters living at certain addresses insufficient to show lack of residence in District 4.

<u>ANALYSIS</u>

*1.* *Standard of Review*

¶28. This Court reviews questions of law de novo. ***Boyd v. Tishomingo Cnty. Democratic Exec. Comm.***, 912 So. 2d 124, 128 (Miss. 2005). This Court reviews the trial judge's findings of fact in a bench trial for manifest error, and will not upend the verdict unless it is manifestly against the weight of credible evidence or a is product of prejudice, bias, or fraud. ***Id.***

> While reviewing any irregularities in the election and voting procedures, our desire for mandatory compliance with voting statutes is balanced with the recognition that mere technical irregularities in the casting of ballots will not be grounds for invalidation absent evidence of fraud or intentional wrongdoing. *Straughter v. Collins*, 819 So. 2d 1244, 1252 (Miss. 2002); *Rogers v. Holder*, 636 So. 2d 645, 648 (Miss. 1994). In determining whether failure to comply strictly with a statute will void an election, the key is whether the act constitutes "such a total departure from the fundamental provisions of the statute as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain." *Riley v. Clayton*, 441 So. 2d 1322, 1328 (Miss. 1983)[, *overruled on other grounds by Lewis v. Griffith*, 664 So. 2d 177 (Miss. 1995)].

*Boyd*, 912 So. 2d at 129.

¶29.    In an election contest, the burden is on the petitioner to prove both the existence of illegal votes and that enough were cast to change the election's outcome. *Id.* at 130. An election may also be invalidated "when there has been a 'substantial failure' to comply materially with the applicable statutes and the intent of the voters is impossible to ascertain." *Id.* (quoting *Walker v. Smith*, 233 Miss. 255, 57 So. 2d 166, 166-67 (1952)).

*2.    SEMS*

¶30.    SEMS is used by the state of Mississippi to maintain a centralized voter database. Miss. Code Ann. § 23-15-165 (Rev. 2018).    The secretary of state is charged with implementing and maintaining SEMS. *Id.*  When counties change their district boundaries, the election commissioners must cause the voter rolls as maintained in SEMS to change. Miss. Code Ann. § 23-15-283(1) (Rev. 2018).  "Only officials certified by the Secretary of State shall be authorized to implement boundary line changes in the Statewide Elections Management System." Miss. Code Ann. § 23-15-283(2) (Rev. 2018).  Such certification is available to circuit clerks. *Id.*  "Any governmental entity authorized to adopt, amend or

change boundary lines shall immediately forward all changed boundary lines to the appropriate circuit clerk, who shall, if authorized under subsection (2), implement the boundary line changes in the Statewide Elections Management System." Miss. Code Ann. § 23-15-283(3) (Rev. 2018). In its minutes, the board of supervisors did indeed direct the circuit clerk to implement the 2011 district boundary line changes. "It is the settled law of this State that, in the absence of proof to the contrary, it will be presumed that public officers performed their duty in the manner required by law." *Caruthers v. Panola Cnty.*, 205 Miss. 403, 416, 38 So. 2d 902, 905 (1949). Thus, to prove his challenge to SEMS, Harreld must overcome the presumption that the board of supervisors, the election commission, the circuit clerk, and the secretary of state performed their duties regarding SEMS in the manner required by law.

¶31. The circuit court noted that Harreld did not join the secretary of state or any of the managers of SEMS in this lawsuit, nor did he raise any potential problems regarding SEMS with officials. Harreld's own expert admitted that the various maps used contain discrepancies between one another and that he used addresses to make his determinations, while the GIS system he used to identify the addresses utilizes parcel numbers. Harreld's witness gave his own opinion regarding the boundary lines of District 4 based on the metes-and-bounds description, and then used various mapping tools, which had discrepancies, to determine whether an address fell within his determination of the District 4 boundaries.[4] Yet

---

[4]The dissent incorrectly claims that Barnes used "maps . . . approved by the Board." Diss. Op. ¶ 65. Barnes specifically testified that he used the online Madison County "map viewer" and combined it with Google Earth to make his conclusions. Nothing in the record indicates that the Madison County Board of Supervisors has approved Google Earth.

17

Harreld presented no evidence regarding the official methodology or maps used by election officials or by SEMS to determine boundary lines and whether certain locations were within or without those official maps' boundary lines. In other contexts, this Court has recognized that official land surveys sanctioned by the government are better evidence of boundaries than private surveys. *H. Weston Lumber Co. v. Strahan*, 128 Miss. 54, 90 So. 452 (1922). Additionally, this Court has implicitly recognized that surveying is not an exact science, and has decided many cases in which boundary lines were in dispute, an issue that would rarely arise if one surveyor's opinion was always definitive. *See RW Dev., LLC v. Miss. Gaming Comm'n*, 307 So. 3d 404 (Miss. 2020) (competing land surveys); *Lucas v. Lucas*, 116 So. 2d 402 (Miss. 1959) (six different surveys were performed and submitted to the court); *Greer v. Pickett*, 127 Miss. 739, 90 So. 449 (1922). This is even truer when the actual survey was not introduced into evidence, only some testimony regarding it. Indeed, the record indicates that mapping by the Central Mississippi Planning and Development District was utilized to input the boundary lines into SEMS, yet Harreld did not produce any official map. Moreover, Harreld did not introduce any maps or surveys whatsoever into evidence, thus Barnes's opinion was not supported by any documentary evidence.[5]

¶32.    Harreld maintains that this case is similar to *Barbour v. Gunn*, in which this Court found that voters within a district's boundaries were denied the right to vote in that district. *Barbour v. Gunn*, 890 So. 2d 843 (Miss. 2004). Yet, in that case, the Court had before it the

---

[5]It is important that this Court base its opinion on facts in the record before it. *See Williams v. City of Batesville*, 313 So. 3d 479, 491-92 (Miss. 2021) (Griffis, J., concurring in part and in result) (noting that a brief referred to was not in the record before the Court and stating the importance of basing opinions on evidence in the record).

*official* map explicitly adopted by the Legislature as depicting the boundary lines.[6] ***Id.*** at 848.

Harreld did not produce an official map nor evidence that SEMS did not comply with such a map. Harreld likewise did not produce evidence regarding the methodology used by SEMS nor any evidence that such methodology is faulty. The dissent would require Banks to defend SEMS. But Harreld, not Banks, had the burden of proof to show that it caused illegal votes—a burden nearly impossible to meet when Harreld failed to even place the allegedly faulty map into evidence to demonstrate its faults. He only had his own witness allegedly draw his own boundary lines (those renderings are not in evidence) and render an opinion regarding what was contained within them.[7] Harreld did not produce anything official other

---

[6]The dissent tries to lessen the impact of the Legislature's declaration that this map was to be used by stating that the Court "interpreted" it as such and that the Court did not declare the map to be the "official map" for all election petitioners going forward. Diss. Op. ¶ 72. This Court in no way suggests that the Census map used in ***Barbour*** is an official map that we must use in election contests going forward, and such a suggestion borders on the absurd. In that case, the legislative body in charge of drawing the districts "*demanded* that the Census maps be used to determine precinct lines" for the districts to which its Joint Resolution applied because "[t]he clear language of the Joint Resolution is that the Census map should control all districts." ***Barbour***, 890 So. 2d at 848 (emphasis added). The Legislature determined the map to use. In this case, the board of supervisors determined the metes and bounds description, and the county used the map drawn by the CMPDD. The Board never approved Google Earth as a method to be used to determine district boundaries, and Harreld never bothered to enter the map by the CMPDD into evidence to show that certain addresses did or did not fall within it.

[7]The dissent's much ado about Barnes's testimony being "undisputed" reflects a misunderstanding about a burden of proof, including the presumption that officials perform their duty. Harreld had the burden to prove the votes were illegal and Banks had no duty to defend the votes. Harreld may fail to meet the burden of proof if the evidence he introduces is not sufficient. Were defendants required to defend against any "undisputed" evidence, no matter how sparse that evidence is, the Mississippi Rules of Civil Procedure's process for directed verdicts would be moot. Miss. R. Civ. P. 50. Moreover, simply because a court reviews evidence does not mean that the court must accept or credit the evidence. *See* ***Karpinsky v. Am. Nat'l Ins. Co.***, 109 So. 3d 84, 90–91 (Miss. 2013) ("[E]ven if we assume

19

than the metes and boundaries description, much less refute the presumption that any official map or methodology was accurate. The dissent maintains that Madison County officials and the secretary of state utterly failed in their duties to accurately maintain SEMS, and would essentially upend the entire SEMS system based on the opinion of one private surveyor, without this Court even having viewed the map or survey about which the private surveyor testified. This Court declines to find that so many public officials were derelict in their official duties based on such scant evidence; thus, the circuit court did not commit manifest error in determining that Harreld did not meet his burden of proof to show that the 217[8] voters he claims were misplaced by SEMS indeed cast illegal votes.

### 3. Voter Addresses

¶33. On appeal, Harreld claims that the circuit court erred by not finding that forty-three of the fifty-four people on Windham's list did not live in District 4. He appears to concede that Banks sufficiently proved that eleven individuals did indeed reside at the address at which Harreld alleged they did not. Harreld also argues that the circuit court erred by finding

___

that Defendants, who made the motion for summary judgment, waived their objection to the affidavit, this does not mean that the trial court, or an appellate court, is bound to accept the uncontested affidavit as competent evidence under the requirements of Rule 56, sufficient to establish facts for summary-judgment purposes. Rather, it means only that a court should not strike the affidavit and should consider it if the objection is waived."). A trial court is the judge of credibility, not this Court, and the trial court in this case reviewed the contradictory testimony of Barnes; its decision indicates that it found the lone, contradictory opinion lacking. *City of Jackson v. Lipsey*, 834 So. 2d 687, 691 (Miss. 2003) ("[T]he trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses.").

[8]Barnes opined that 205 voters' addresses were located in the incorrect district and that one precinct where twelve voters voted in the District 4 election was outside of District 4, totaling 217 voters.

that he did not provide sufficient proof that the twenty-five voters registered at the Tougaloo dormitory no longer resided in District 4. Thus, Harreld calls into question the addresses of sixty-eight voters. Harreld claims that he should be relieved of his burden to prove abandonment of the domicile because Banks failed to provide "evidence these addresses were *ever* the voters' 'permanent home and principal establishment.' With no such evidence, Harreld bore no burden to show the voters abandoned the addresses with no intent to return to them." He also contends that the evidence he provided should constitute a rebuttable presumption that the domicile was abandoned and that Banks should then have to prove that the addresses were actually the voters' domiciles, arguing that "the burden should be Banks'[sic], as the party seeking to defend the lawfulness of these votes, to show the addresses were, somehow, the voters' domiciles." Harreld essentially asks this Court to flip the burden of proof that the party seeking to overturn the election must prove the votes were illegal and to abandon longstanding caselaw on residency.

¶34. The residency requirements for voter eligibility in county elections provide that a person otherwise qualified and who has resided "for thirty (30) days in the county in which he or she seeks to vote" "shall be a qualified elector in and for the county, municipality and voting precinct of his or her residence[.]" Miss. Code Ann. § 23-15-11 (Rev. 2018). If a voter moves to a different ward or precinct within the county, that voter is not disqualified to vote, but is entitled to have the registration moved to the new ward or precinct. Miss. Code Ann. § 23-15-13 (Rev. 2018). A presumption exists that the election officials' act of leaving a voter in the pollbooks renders the voters legal voters. *Hubbard v. McKey*, 193 So.

21

2d 129, 131 (Miss. 1966). This presumption exists because election commissioners are required to purge the voter rolls of ineligible voters, including those who do not meet the residency requirement. *Id.* at 132; Miss. Code Ann. § 23-15-153(1) (Rev. 2018) ("Except for the names of those voters who are duly qualified to vote in the election, no name shall be permitted to remain in the Statewide Elections Management System[.]"). However, "no name shall be purged from the Statewide Elections Management System based on a change in the residence of an elector except in accordance with procedures provided for by the National Voter Registration Act of 1993." *Id.*

¶35. As adopted for state elections by the Legislature in Mississippi Code Section 23-15-153, the National Voter Registration Act of 1993 provides certain steps for the removal from voting rolls due to a change in residence:

**(d) Removal of names from voting rolls**

(**1**) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant–

(**A**) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or

(**B**)(**i**) has failed to respond to a notice described in paragraph (2); and

(**ii**) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

52 U.S.C.A. § 20507(d).[9] Wray's testimony indicated that these are the steps the Madison County Election Commission takes when purging the voter rolls based on residency. Harreld did not provide any evidence that any of these steps had occurred for any of these voters, which would render removal of the voters at issue from the voter rolls contrary to statute.

¶36. The party contesting a vote due to residency "has the burden of proof to show that voters were disqualified and how they voted" and "[t]he presumption of legality of [the] vote must be overcome by affirmative proof." *Hubbard*, 193 So. 2d at 132. For purposes of voting law, residence and domicile are equivalent, and a domicile or residence "continues until removal to another locality with intent to remain there and abandonment of the old domicile without intent to return." *Id.* In other words, "a domicil is not lost until a new one is acquired, a domicile once existing cannot be lost by mere abandonment even when coupled with the intention to acquire a new one, but continues until a new one is in fact gained." *Jones v. State ex rel. McFarlane*, 207 Miss. 208, 215, 42 So. 2d 123, 126 (1949) (internal quotation mark omitted) (quoting 17 Am. Jur. § 18).

¶37. Thus, because a change of address within a district or precinct would not deprive a voter of the right to vote within that district or precinct, Harreld must provide sufficient

---

[9]For purposes of federal law,

> In the case of a change of address, for voting purposes, of a registrant to another address within the same registrar's jurisdiction, the registrar shall correct the voting registration list accordingly, and the registrant's name may not be removed from the official list of eligible voters by reason of such a change of address except as provided in subsection (d).

52 U.S.C.A. § 20507(f).

23

evidence that the voters in question both abandoned District 4 residency and established residency outside of District 4. Deciding the issue of residency based on the evidence is generally a question of fact. *Hubbard*, 193 So. 2d at 131. Harreld has provided no such evidence. Harreld failed to call any of the voters at issue, despite having their names. Moreover, Banks's witnesses undermined the accuracy of Windham's conclusions. Additionally, statutory law has provided that certain steps must be undertaken to remove a voter from the rolls for a change of residence. Since the election commission has not purged these voters due to residency, Harreld must overcome the presumption that the votes were legal. Not only has Harreld failed to present sufficient evidence that an abandonment of District 4 residency occurred in the first place, he also fails to provide any evidence whatsoever that residency was established outside of District 4. Nor does he allege that the proper steps were taken to allow these voters to be removed from the voter rolls. The circuit court ultimately found that Harreld failed to meet his burden of proof that these residents had abandoned District 4. This finding was not manifest error.

### 4. *Split Precinct Ballots*

¶38. Harreld claims that thirty-seven incorrect ballot styles were issued at split precincts. These numbers are based on incorrect calculations. The thirty-seven allegedly illegal ballots include at least twenty ballots from Twin Lakes precinct, at which Perry testified that 244 people should have received ballot style 27 and that he counted 264 style 27 ballots actually cast. Yet the voter rolls in the record make clear that 265 voters should have received ballot style 27, not 244 voters as counted by Perry. The twenty allegedly illegal votes therefore do

24

not exist, since that number is premised on twenty-one fewer voters than it should have been.

¶39. Also included in the thirty-seven allegedly illegal votes are the thirteen allegedly illegal votes from the Fellowship Bible Church precinct. But that number depends on a total of 364 votes being cast from that precinct in the District 4 race, when the official recapitulation lists 351 votes being counted from that precinct in the District 4 race, exactly thirteen votes less than 364. The record indicates, therefore, that the thirteen allegedly illegal votes do not exist. The record consequently does not support Harreld's claims of illegal votes being cast in split precincts, and it likewise does not support a showing of substantial failure to materially comply with election statutes. The circuit court did not manifestly err when it determined that Harreld failed to meet his burden of proof that voters in split precincts cast illegal votes.

### 5. *Absentee Ballots*

¶40. "[Mere technical irregularities in the casting of a ballot are not grounds for invalidation absent evidence of fraud or intentional wrongdoing." *Straughter*, 819 So. 2d at 1252. "If the integrity of a ballot is unquestioned, there is no good reason to disenfranchise a voter for some technical aberration beyond his control." *Wilbur v. Hobson*, 608 So. 2d 1187, 1193 (Miss. 1992). "In determining whether failure to comply strictly with a statute will void an election, the key is whether the act constitutes 'such a total departure from the fundamental provisions of the statute as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain.'" *Boyd*, 912 So. 2d at 129 (quoting *Riley*, 441 So. 2d at 1328).

25

Long ago in *Guise v. McGehee*, 155 Miss. 858, 124 So. 643, 644 (1929), we held:

> In determining the effect of irregularities through mistakes of voters and election officials, all statutes limiting the voter in the exercise of his right of suffrage are construed liberally in his favor, in order to ascertain the will of the majority of the voters.

> This principle is still sound. If the integrity of a ballot is unquestioned, there is no good reason to disenfranchise a voter for some technical aberration beyond his control.

*Wilbur*, 608 So. 2d at 1193. In that vein, this Court has held that when an absentee ballot was filled out and notarized by the circuit clerk, the integrity of the application is strengthened, rendering mistakes more likely to be technicalities and making it more difficult to justify invalidating the vote. *Boyd*, 912 So. 2d at 132. Harreld does not allege any fraud or intentional wrongdoing.

### a. Signatures on Applications Matching Envelopes (6 Ballots)

¶41. Poll workers must compare the signature on an absentee ballot application with the signature on the envelope. Miss. Code Ann. § 23-15-639(1)(b) (Rev. 2018). If the signature "corresponds" and the affidavit is "sufficient," then the envelope is opened. *Id.* Poll workers determined that these six application signatures did correspond to the signatures on the envelopes. Perry admitted he is not a handwriting expert, and Harreld offered no evidence other than Perry's opinion on the signatures. *Cf. Pegram v. Bailey*, 708 So. 2d 1307 (Miss. 1997) (evidence that signatures did not correspond included evidence of voter's signature including past signatures from a family bible, the signature of her daughter who was alleged to sign for her, and witness testimony that her daughter signed for her); *see also Smith v.*

*Hollins*, 905 So. 2d 1267, 1273, 1274 (Miss. 2005) (noting that even when voter signatures appeared "to be the writing of the person who filled out and attested the application," the petitioner "failed to prove by a preponderance of the evidence that the signature was not that of [the voter]"). Moreover, each of these applications, ballots, and envelopes was executed in the circuit clerk's office, strengthening the integrity of the application. Harreld does not allege that the circuit clerk allowed two different people to sign each of these applications and envelopes in the same transaction, nor does he allege any other fraud or wrongdoing. The circuit court therefore did not commit manifest error by finding that Harreld failed to meet his burden of proof to demonstrate that these ballots were illegal.

      *b.*       *Applications Not Signed by Voter (2 Ballots)*

¶42.    This Court has held that unsworn voter signatures invalidate an absentee ballot; it follows that applications completely lacking a voter signature also invalidate an absentee ballot. *Smith*, 905 So. 2d at 1275. Because the signature on the application and the envelope must be compared, the signatures are integral parts of the voting requirements, and are mandatory rather than discretionary. Executing the application is required of the voter by statute, and the signature is required to be verified by poll worker prior to counting the ballot. Miss. Code Ann. §§ 23-15-715(a), 23-15-639(1)(b) (Rev. 2018). This Court has also held that sworn signatures on absentee envelope flaps were determined by the Legislature to be integral to an election's integrity. *Boyd*, 912 So. 2d at 130 (dicta) (citing Miss. Code Ann. § 23-15-633 (Rev. 2001)). Similarly, the Legislature's requirements that the voter sign an absentee ballot application and that the signature be examined by the poll worker indicate the

27

Legislature's determination that the signatures are integral to the election's integrity. The circuit court should have found that these two votes were illegal. However, Harreld offered no evidence regarding for whom these voters voted in the District 4 race, despite knowing their names and addresses. Harreld did not call the two voters to testify and instead relies on a mathematical formula to determine how these votes should be subtracted from the vote total. Harreld failed to offer evidence to prove that these two votes were cast for Banks and should have been subtracted from Banks's vote total.

       *c.*      *Signatures Unmatching, No Seal for Attesting Witness (1 Ballot)*

¶43. For the same reasoning as previously discussed regarding whether the signatures correspond, the circuit court did not err by finding that Harreld failed to meet his burden of proof to show this vote was illegal based on alleged signature mismatches.

¶44. Harreld claims that this ballot is also illegal because the attesting witness was ineligible given that no seal accompanied the signature. An exception for requiring a seal or title for the attesting witness exists. "[I]n the case of an absent elector who is temporarily or permanently physically disabled, the attesting witness may be any person eighteen (18) years of age or older and such person is not required to have the authority to administer an oath." Miss. Code Ann. § 23-15-631(1) (Rev. 2018).

¶45. While the reason marked on this application was that the voter was over sixty-five years of age, it is certainly possible that a voter may be *both* over sixty-five years of age and disabled. This Court has held that the total failure of an application to state a reason for voting absentee does not invalidate the vote. ***Boyd***, 912 So. 2d at 132. In ***Boyd***, the

28

applications that failed to state a reason for voting absentee were filled out and notarized by the clerk, strengthening their integrity. *Id.* It follows, therefore, that marking one of several potential reasons does not automatically invalidate a ballot. The attesting witness signed the absentee ballot application in the location denoted for witnesses for disabled voters. The voter envelope given to this voter by the circuit clerk is entitled "Absentee Ballot for Person Having Temporary or Permanent Physical Disabilities." The envelope is signed by an attesting witness who is a different person than the attesting witness who signed the application. The portion of the envelope that is to be filled out if the voter needed assistance filling out his or her ballot is also filled out by a person who is a different person than either of the attesting witnesses. Three separate people and the voter signed this voter's application and envelope, increasing its integrity. The record indicates that the voter is both over the age of sixty-five and disabled, and disability renders a seal statutorily unnecessary. The circuit court did not manifestly err by determining that Harreld did not meet his burden of proof to prove this vote was illegal.

### d.      Ineligible Witness (1 Ballot)

¶46.    Harreld claims that this application used an ineligible witness. The application checked both that the voter was over sixty-five years of age and that the voter was responsible for a disabled person. The attesting witness signed in the location for witnesses for disabled voters. The voter envelope given to this voter by the circuit clerk is entitled "Absentee Ballot for Person Having Temporary or Permanent Physical Disabilities." The envelope is signed by an attesting witness who is a different person than the attesting witness

29

who signed the application. For the same reasons previously discussed regarding ineligible witnesses, the circuit court did not manifestly err by determining that Harreld failed to meet his burden of proof to prove this vote was illegal.

e. *Envelope Signatures Do Not Cross the Flap (8 Ballots)*

¶47. Statutory law requires that any signature lines printed on voting envelopes be across the flap of the envelope.

> On any envelope where the elector's signature and the signature of the attesting witness are required, the signature lines and the signatures shall be across the flap of the envelope to insure the integrity of the ballot and the following shall be printed on the flap on the back of the envelope in bold print and in a distinguishing color: "YOUR VOTE WILL BE REJECTED AND NOT COUNTED IF THIS ENVELOPE IS NOT SIGNED ACROSS THE FLAP OF THIS ENVELOPE BY YOU AND AN ATTESTING WITNESS."

Miss. Code. Ann. § 23-15-633 (Rev. 2018). On each of the eight envelopes, the voter signed on the signature line provided, which is mandated by law to be across the flap. In several of the copies, it is obvious that the signature goes from one side of the envelope flap to the other side of the envelope flap. Moreover, five of the eight ballots were executed at the circuit clerk's office, increasing the integrity of the ballots. The circuit court did not manifestly err by rejecting Harreld's claims that the signatures did not cross the flap.

f. *Poll Worker Notes Could Not Find Voter (2 Ballots)*

¶48. Perry testified that poll worker notes on two absentee ballot applications indicated that the poll workers could not find the voter in the voter rolls. Perry could not remember if he had checked the voter rolls to ascertain whether these two voters were included on them. Both ballots were executed at the circuit clerk's office. Wray testified that it was standard

30

procedure for the circuit clerk's office to verify a voter on the voter rolls when he or she presented to the circuit clerk's office to vote absentee. No testimony was adduced regarding what occurred after the notes were written. Harreld offered no evidence other than mere speculation that these voters were not actually on the voter rolls. Therefore, the circuit court did not manifestly err by accepting these absentee ballots.

g.      *No Reason, Witness Ineligible, Envelope Signature Across Flap (1 Ballot)*

¶49.    This application had the attesting witness signature in the location for a witness for a disabled voter. The voter envelope given to this voter by the circuit clerk is entitled "Absentee Ballot for Person Having Temporary or Permanent Physical Disabilities." The envelope is signed by an attesting witness who is a different person than the attesting witness who signed the application. Moreover, the voter signed the envelope on the envelope signature line, which is legally required to be across the flap. For the same reasons previously discussed regarding failure to mark the reason for voting absentee, ineligible witnesses, and signatures crossing the flap, the circuit court did not manifestly err by determining that Harreld failed to meet his burden of proof to prove this vote was illegal.

h.      *No Reason, Witness Ineligible, No Envelope Signature (1 Ballot)*

¶50.    This Court has found that the total lack of a voter's signature on the ballot envelope invalidates the vote. *Boyd*, 912 So. 2d at 131. Therefore, this vote should have been invalidated. However, Harreld offered no evidence regarding for whom this voter voted in the District 4 race, despite knowing the voter's name and address. Harreld did not call the voter to testify and instead relies on a mathematical formula to determine how this vote

should be subtracted from the vote total. Harreld failed to show that this vote was cast for Banks and should have been subtracted from Banks's vote total.

### i.     *No Envelope Signature (1 Ballot)*

¶51.    This Court has found that the total lack of a voter's signature on the ballot envelope invalidates the vote. *Boyd*, 912 So. 2d at 131. Therefore, this vote should have been invalidated. However, Harreld offered no evidence regarding for whom this voter voted in the District 4 race, despite knowing the voter's name and address. Harreld did not call the voter to testify and instead relies on a mathematical formula to determine how this vote should be subtracted from the vote total. Harreld failed to show that this vote was cast for Banks and should have been subtracted from Banks's vote total.

### j.     *No Witness Signature, Envelope Signature Across Flap (1 Ballot)*

¶52.    This Court has found that an absentee ballot application that is not sworn and attested invalidates the absentee ballot. *Smith*, 905 So. 2d at 1275. Therefore, this vote should have been invalidated based on the lack of witness signature. However, Harreld offered no evidence regarding for whom this voter voted in the District 4 race, despite knowing the voter's name and address. Harreld did not call the voter to testify and instead relies on a mathematical formula to determine how this vote should be subtracted from the vote total. Harreld failed to show that this vote was cast for Banks and should have been subtracted from Banks's vote total.

### k.     *Witness Signature Missing (2 Ballots)*

¶53.    This Court has held that the absence of an attesting witness signature on the ballot

envelope invalidates the ballot. *Smith*, 905 So. 2d at 1271. Therefore, these two votes should have been invalidated. However, Harreld offered no evidence regarding for whom these voters voted in the District 4 race, despite knowing their names and addresses. Harreld did not call the two voters to testify and instead relies on a mathematical formula to determine how these votes should be subtracted from the vote total. Harreld failed to show that these two votes were cast for Banks and should have been subtracted from Banks's vote total.

l.      *Uncounted Absentee Ballots (6 Ballots)*

¶54.    Harreld claims that six absentee ballots that should have been treated as resolution ballots went uncounted. The only evidence he offers is Perry's testimony that they were not counted and not treated as resolution ballots, because he could mathematically ascertain that they were not counted. The circuit court asked Perry how he knew that the resolution board did not examine and reject these ballots. Perry responded that such information would be in the minutes of the resolution board, and he admitted he did not examine the minutes. The only evidence Harreld offers in support of this claim is mere speculation. The circuit court did not manifestly err by finding that Harreld failed to meet his burden of proof to show that these ballots were illegal.

## 6.      Affidavit Ballots

¶55.    In his petition and at trial, Harreld took issue with numerous affidavit ballots. On appeal, Harreld raises only three of those ballots. Harreld takes issue with three affidavit ballots that were marked "rejected." Perry testified that he could tell numerically that the

33

three ballots were incorrectly counted, despite being rejected. The record does not support the numbers that form the basis of this allegation. Perry stated that he found six affidavit envelopes, three of which were marked as rejected. He testified that the precinct registered six affidavit votes, and that must therefore equate to the three rejected votes having been unlawfully counted.[10] The affidavit register contained seven names, and Perry testified that two of the names on the six envelopes he found were missing from the register. That accounts for nine total affidavit ballots cast at the precinct. Six affidavit votes were accepted and three were rejected, accounting for the three rejected affidavits. The circuit court did not manifestly err by finding Harreld failed to meet his burden of proof regarding invalidating these three ballots.

### 7. *Uninitiate Ballots*

¶56. Harreld asks that four uninitiate ballots cast for Banks be invalidated. This Court has held that the failure of a poll manager or assistant manager to initial a ballot is a technical irregularity that will not invalidate a vote absent evidence of fraud or intentional wrongdoing. *Smith*, 905 So. 2d at 1270. Harreld does not allege fraud or intentional wrongdoing. The circuit court did not err by declining to invalidate these four ballots.

## CONCLUSION

¶57. Harreld contests hundreds of votes in the District 4 supervisor election that he lost by a margin of fifty-seven votes. He does not allege any fraud or intentional wrongdoing. The

---

[10]Perry contends that the ballots must have been counted because the envelopes were opened, but this amounts to mere speculation. Indeed, this Court in *Wilbur* noted that, in that election, eight affidavit ballots were opened, and the election commission rejected two of those eight ballots. *Wilbur*, 608 So. 2d at 1193.

circuit court found that Harreld failed to meet his burden of proof that any of the votes were illegal. It also found that any irregularities did not substantially impair the integrity of the election and that it could ascertain the will of the voters. The circuit court erred by failing to find seven of those absentee ballot votes, all of which were lacking critical signatures, illegal. However, Howard failed to offer evidence regarding how those seven voters voted in the District 4 race, despite having their names and contact information available on the absentee ballot applications and envelopes. Even if all seven of those voters cast votes for Banks, his margin of victory would decrease to fifty votes, failing to change the outcome of the election. Further, the will of the voters remains ascertainable, and Harreld failed to prove any substantial failure to materially comply with election statutes. Because the circuit court did not manifestly err by holding that Harreld failed to meet his burden of proof of illegality on all but seven votes and did not err by finding that the will of the voters to elect Banks was ascertainable, this Court affirms the judgment of the circuit court.

¶58. **AFFIRMED.**

**KITCHENS, P.J., COLEMAN, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH, C.J., AND MAXWELL, J.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶59. Because I find reversible error, I would reverse and remand for a special election.

I.      *Mistakes in SEMS*

¶60. In Mississippi, a voter's right to participate in an election depends on their residence. The qualifications to vote are set forth in Mississippi Code Section 23-15-11 (Rev. 2018):

35

> Every inhabitant of this state . . . who is a citizen of the United States of America, eighteen (18) years old and upwards, who has resided in this state for thirty (30) days and for thirty (30) days in the county in which he or she seeks to vote . . . shall be a qualified elector in and for the county . . . and voting precinct of his or her residence, and shall be entitled to vote at any election . . . .

A challenge to voter qualifications may be brought on the grounds that a "voter is not a resident in the precinct where the voter is registered." Miss. Code Ann. § 23-15-571(3)(d) (Rev. 2018).

¶61. The Madison County Board of Supervisors had the authority, duty, and responsibility to determine the boundary lines of District 4. Miss. Code Ann. § 23-15-283 (Rev. 2018). The Board worked with the Central Mississippi Planning and Development District to plot out new district lines based on the 2010 U.S. Census data. The Board divided Madison County into five supervisors districts. These districts were determined based on maps, and the boundaries were platted with metes-and-bounds land descriptions.

¶62. The Board agreed on the districts and submitted the proposed district lines to the United States Department of Justice for approval or "pre-clearance" before the districts were finalized. These districts were approved or precleared. The Board then adopted the new district lines.

¶63. The new district lines were to be followed in Madison County elections. The Madison County voter rolls were to be changed based on the new district lines. The Madison County Election Commissioners were required to ensure the voter rolls, as maintained in SEMS, conformed with the new district lines. Miss. Code Ann. § 23-15-283. A vote cast in a district race other than where the voter resides is not lawful.

¶64. Harreld challenges the election results. He alleged that there were errors in SEMS that resulted in one hundred individuals voting in the District 4 election who did not reside in District 4. Harreld also alleged that there were 105 individuals who resided in District 4 but were given ballots for and actually voted in another District's election.

¶65. At trial, Harreld presented the expert testimony of Mike Barnes, a land surveyor. Barnes testified that he surveyed District 4 by using the maps and the metes-and-bounds legal description approved by the Board. Based on his comparison with SEMS, Barnes determined that one hundred individuals voted in the District 4 election that did not reside within the boundaries of District 4 as established by the Board's metes-and-bounds legal description of District 4 as adopted by the Board of Supervisors in 2011. Barnes also accounted for minor inconsistencies. Further, Barnes testified that the mistakes in SEMS also resulted in 104 individuals voting in a district election other than District 4 despite the fact that such individuals resided in the legal boundaries of District 4. Barnes's testimony was undisputed.

¶66. In his opinion, the trial judge found:

> While certainly not dispositive of the issue it is noted that the district lines where adopted by the Madison County Board of Supervisors on May 31, 2011. There have been numerous federal, state and local elections completed which included the votes cast in District 4. In fact, Harreld has participated as a candidate in the district prior to this election. This issue has never been raised in any election, nor has the issue been presented to any of the election officials in charge of maintaining SEMS placement of registered voters.

The judge's finding that there have been several elections since the Board adopted the district lines in 2011 without a challenge SEMS is simply not relevant and of no legal effect. Also, the finding that Harreld had "participated as a candidate in the district prior to this

37

election" is not supported by the evidence and appears to be incorrect. Likewise, the statement that this issue has "never been raised in any election, nor has the issue been presented to any of the election officials in charge of maintaining SEMS placement of registered voters" is of no legal effect. Although these statements are interesting, there is simply no evidence to support these findings, and none of these findings has any bearing on the outcome of this case or any legal issue presented in this election contest.

¶67. Next, the trial judge found:

> Harreld presented the testimony of one witness who stated his opinion as to the metes and bounds boundary lines of District 4 and his opinion as to the misplacement by SEMS of voters Harreld complains of. The state and county election officials who maintain the SEMS system and the placement of voters within districts where not parties to this action, nor where they called as witnesses. In short, they were not given the opportunity to defend the district boundary lines and the placement of voters therein.

This finding recognized that no evidence contradicted or disputed Barnes's testimony about the mistakes in SEMS. However, this finding does seems to indicate that there is a legal requirement that Harreld join the secretary of state in this action or call a witness from the secretary of state's office who maintains the SEMS system. There is simply no requirement that the secretary of state be "given the opportunity to defend the district boundary lines and the placement of voters therein." Harreld's challenge was to how the Madison County Election Commissioners had improperly input the residential information of more than two hundred voters. Evidence to defend SEMS would have been the responsibility of Banks to offer. Banks certainly could have offered such evidence, but he did not.

¶68. Finally, the trial judge found:

38

> Voters who cast votes in the present election voted the only place they would have been allowed to vote. Had they presented at other polling places, they would not have been able to cast their ballot. For this Court to invalidate the votes of the voters Harreld complains of, this Court would, in effect, disenfranchise numerous registered voters in Madison County, Mississippi. If, in fact, there are questions relating to the placement of voters within the SEMS system, those questions should be presented to those in charge of its management. Without an official change by state and local election officials in the placement of the registered voters complained of, this Court declines to invalidate those votes and, thereby disenfranchise those citizens.

In this finding, the trial judge ignores the undisputed evidence. Further, the trial judge fails to recognize that it is his responsibility in this election contest to decide whether illegal votes were cast. Rather than consider the task at hand, the trial judge concluded that more than two hundred votes would be allowed to stand because that to invalidate those votes would be to "disenfranchise" those voters. This was not the proper legal standard for the trial judge to consider.

¶69. In an election contest, the court is called to void an election only if, as was demonstrated here, "there has been such a departure from statutory compliance 'as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain.'" **Waters v. Gnemi**, 907 So. 2d 307, 315-16 (Miss. 2005) (quoting **Riley v. Clayton**, 441 So. 2d 1322, 1328 (Miss. 1983), *overruled by* **Lewis v. Griffith**, 664 So. 2d 177 (Miss. 1995) (overruling a judicial allowance or deviation from a statute)).

¶70. In **Boyd v. Tishomingo County Democratic Executive Committee**, this Court discussed the law to be applied to adjudicate an election contest:

> While reviewing any irregularities in the election and voting procedures, our desire for mandatory compliance with voting statutes is balanced with the recognition that mere technical irregularities in the casting

39

of ballots will not be grounds for invalidation absent evidence of fraud or intentional wrongdoing. In determining whether failure to comply strictly with a statute will void an election, the key is whether the act constitutes such a total departure from the fundamental provisions of the statute as to destroy the integrity of the election and make the will of the qualified electors impossible to ascertain.

. . . .

Boyd alleges that there were a number of illegal votes cast in this election; therefore, the burden is on him, as the contestant, to prove both the existence of these illegal votes and that there were enough cast to change the election's result. Additionally, an election may be invalidated when there has been a "substantial failure" to comply materially with the applicable statutes and the intent of the voters is impossible to ascertain.

If a petitioner succeeds in an election contest below, an alternatively-pronged test is applied to determine whether a special election is warranted. In such a situation, a special election will be required if either "(1) enough illegal votes were cast for the contestee to change the election result or (2) the amount of votes disqualified is substantial enough that it is impossible to discern the will of the voters."

***Boyd v. Tishomingo Cnty. Exec. Comm.***, 912 So. 2d 124, 129-31 (Miss. 2005) (citations omitted).

¶71.    The trial judge failed to consider the election-contest claim based on the proper legal standard. Harreld met his burden and proved that there were 205 illegal votes cast in this election. Harreld also presented sufficient undisputed evidence that there were enough illegal votes cast to change the election's result. As a result, this Court has a responsibility to invalidate an election when there has been a substantial failure to comply materially with the applicable statutes, and the intent of the voters is impossible to ascertain.

¶72.    In addition, ***Barbour v. Gunn***, 890 So. 2d 843 (Miss. 2004) is directly on point. The majority says that ***Barbour*** does not apply because Harreld did not produce an "official

map." Maj. Op. ¶ 31. The map used by Gunn in ***Barbour*** was a census map that was attached to the Joint Resolution of the Mississippi House of Representatives. ***Id.*** at 848. The Court interpreted the language of the Joint Resolution to mean that the "census maps be used to determine precinct lines." ***Id.*** This Court did not declare the map discussed in Barbour to be the official map to be referenced by election-contest petitioners thereafter.

¶73. In ***Barbour***, due to voter roll mistakes in two precincts, thirty-eight voters who lived in C2A were allowed to vote in the C2B House District 56 race. ***Id.*** at 845. Additionally, the county executive committee incorrectly determined two and a half streets were not in House District 56, which the petitioner's attached map did not support. ***Id.*** The trial judge agreed with the petitioner and permitted a special election in the erroneous districts. ***Id.*** This Court upheld the judge's ruling and found that the precinct problems were not "technical" but prevented actual residents from voting in the election and potentially suppressed the will of the voters. ***Id.*** at 847-48 (internal quotation marks omitted).

¶74. Likewise, here, the voter rolls did not conform with the official district lines ordered by the Board in 2011. One hundred individuals voted in the District 4 election but did not reside in District 4, and 105 more individuals resided in District 4 but were given ballots for and voted in another district election. We have held:

> In order to determine if a special election is warranted, the facts before the Court must meet the two-pronged test required by ***Noxubee County Democratic Exec. Comm. v. Russell***, 443 So. 2d 1191 (Miss. 1983). Under the first prong of the test, a special election is proper when "enough illegal votes were cast for the contestee to change the result of the election . . . ." ***Id.*** at 1197. The second alternative prong is met if the disqualified votes make it "impossible to discern the will of the voters." ***Rogers v. Holder***, 636 So. 2d 645, 647 (Miss. 1994) (citing ***Stringer v. Lucas***, 608 So. 2d 1351 (Miss.

1992)).

***Thompson v. Jones***, 17 So. 3d 524, 526 (Miss. 2008). Because I find that the trial judge applied the wrong legal standard and that Harreld satisfied both prongs of the correct legal standard, I would reverse the special judge's decision and call for a special election.

¶75.     Because I am of the opinion that the trial judge erred as to the first issue, requiring that we reverse the decision of the Special Judge and order a special election for Madison County Board of Supervisors District 4, no reason exists to address the remaining issues.

**RANDOLPH, C.J., AND MAXWELL, J., JOIN THIS OPINION.**